1
2
3
4
5
6
7
8

**LiLaw Inc.**, a Law Corporation
J. James Li, Ph.D. (SBN 202855, lij@lilaw.us)
Andrew M. Pierz (SBN 292970)
5050 El Camino Real, Suite 200
Los Altos, California 94022
Telephone: (650) 521-5956
Facsimile: (650) 521-5955

Attorneys for Plaintiff Citcon USA LLC and Counter-Defendants Citcon USA LLC and Wei Jiang

9

## UNITED STATES DISTRICT COURT

10

### NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO DIVISION)

11
12
13
14
15
16
17
18
19
20
21
22

| CITCON USA LLC, | Case No. 5:18-cv-02585-NC |
|---|---|
| Plaintiff, | **PLAINTIFF CITCON USA LLC'S AND COUNTER-DEFENDANTS CITCON USA LLC'S AND WEI JIANG'S POST-VERDICT BRIEF** |
| vs. | |
| RIVERPAY INC., a Canadian corporation, RIVERPAY, INC., a Delaware corporation, YUE HUA, a.k.a., YORK HUA, an individual, KENNY E SHI, an individual, HANG "HANK" MIAO, an individual, and DOES 1 through 20, | Courtroom: 5<br>Judge: Nathanael M. Cousins |
| Defendants. | |
| Related Counter Claims | |

23
24

# Redacted Version Refiled Pursuant to Court Order (ECF526)

25
26
27
28



1
2

**TABLE OF CONTENTS**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I.    PUNITIVE AND EXEMPLARY DAMAGES ................................................. 1

   A.   The Law of Punitive Damages for Trade Secret Cases .............................. 1

   B.   Citcon Requests Punitive and Exemplary Damages of $3 Million ............ 2

      1.   RiverPay and Hua Willfully and Maliciously Misappropriated Citcon's Source Code Trade Secrets ................................................................... 3

      2.   The Amount of the Punitive and Exemplary Damages ....................... 9

II.   JOINT AND SEVERA LIABILITY OF DEFENDANTS RIVERPAY AND HUA ................. 11

III.  UNFAIR COMPETITION CLAIMS ......................................................... 12

IV.  INJUNCTION .................................................................................. 12

V.   ATTORNEYS' FEES AND COSTS ......................................................... 14

   A.   Citcon Should Recover Its Fees and Costs for Prosecuting the Source Code Misappropriation Claim ............................................................. 14

   B.   Citcon Should Recover Taxable Costs for the Case as the Prevailing Party ......................... 15

VI.  CONCLUSION ................................................................................. 16



# TABLE OF AUTHORITIES

## CASES

*Agency Solutions.Com LLC v. TriZetto Grp., Inc.*,
    819 F.Supp.2d 1001 (E.D. Cal. 2011) ................................................................. 13

*Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*,
    226 Cal. App. 4th 26 (2014) ............................................................................... 15

*Bankhead v. ArvinMeritor, Inc.*,
    205 Cal. App. 4th 68 (2012) ............................................................................... 10

*Brewer v. Second Baptist Church of Los Angeles*,
    32 Cal. 2d 791 (1948) ........................................................................................... 3

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
    873 F. Supp. 2d 1192 (N.D. Cal. 2012) .............................................................. 12

*Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.*,
    155 Cal.App.3d 381 (1984) ................................................................................. 11

*DVD Copy Control Assn., Inc. v. Bunner*,
    31 Cal. 4th 864 (2003) ........................................................................................ 13

*Egan v. Mut. of Omaha Ins. Co.*,
    24 Cal. 3d 809 (1979) ........................................................................................... 1

*First Commodity Traders, Inc. v. Heinold Commodities, Inc.*,
    766 F.2d 1007 (7th Cir. 1985) ............................................................................ 15

*Fishkin v. Susquehanna Partners, G.P.*,
    No. CIV.A.03-3766, 2007 WL 853769 (E.D. Pa. Mar. 19, 2007) ....................... 12

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) .............................................................................. 13

*Neal v. Farmers Ins. Exch.*,
    21 Cal. 3d 910 (1978) ......................................................................................... 10

*O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*,
    399 F.Supp.2d 1064 (N.D.Cal.2005) ................................................................. 14

*PQ Labs, Inc. v. Yang Qi*,
    No. 12-0450 CW, 2014 WL 4954161 (N.D. Cal. Sept. 30, 2014) ....................... 15

*Rufo v. Simpson*,
    86 Cal. App. 4th 573 (2001) ............................................................................... 11

*Uzyel v. Kadisha*,
    188 Cal. App. 4th 866 (2010) ............................................................................... 1



*Vacco Indus., Inc. v. Van Den Berg,*
    5 Cal. App. 4th 34 (1992) ........................................................................2
*Vallbona v. Springer,*
    43 Cal.App.4th 1525 ............................................................................11
*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
    259 F.3d 1101 (9th Cir. 2001)................................................................2

## STATUTES AND RULES

18 U.S.C. § 1836(b). ......................................................................... 12, 14
Cal. Civ. Code § 3294 ............................................................................... 1
Cal. Civ. Code § 3426 ................................................... 1, 2,,9, 12, 14
Civ. L.R. 54-5 ........................................................................................ 15
Fed. R. CIV. PROC. 54 ........................................................................... 15
Mont. Code Ann. § 30-14-408. ................................................................2



I.   **PUNITIVE AND EXEMPLARY DAMAGES**

   A.   **The Law of Punitive Damages for Trade Secret Cases**

   California law provides generally that

   > In an action for the breach of an obligation not arising from contract, where it
   > is proven by clear and convincing evidence that the defendant has been guilty
   > of oppression, fraud, or malice, the plaintiff, in addition to the actual damages,
   > may recover damages for the sake of example and by way of punishing the
   > defendant.

*Cal. Civ. Code § 3294.*

   Because all torts, including misappropriation of trade secrets, are a breach of obligations based on law instead of contracts, tort plaintiffs in general may recover "damages for the sake of example and by way of punishing the defendant" if "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."[1]

   It is well established that the task of rendering punitive damages has "traditionally been left to the discretion of the jury." *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 821, 620 P.2d 141, 147 (1979). In fact, "[w]hether to award punitive damages if the requirements of Civil Code section 3294, subdivision (a) are satisfied and *the amount of such an award* are questions committed to the trier of fact" (i.e., the jury in this case). *Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 923–24 (2010) (emphasis added).

   This established punitive damages for all torts including trade secret misappropriation is not in any way superseded by CUTSA, which provides in relevant part that "[e]xcept as otherwise expressly provided, this title does not supersede any statute relating to misappropriation of a trade secret…." Cal. Civ. Code § 3426.7(a). Contrary to what Defendants assert, nowhere in CUTSA is there any express provision for preemption of the punitive damage statute, Cal. Civ. Code § 3294. Instead, CUTSA merely states that "[i]f willful and malicious misappropriation exists, the court ***may*** award exemplary damages in an amount not exceeding twice [the compensatory award]." Cal. Civ. Code § 3426.3(c) (emphasis added). Not only does this provision not show any explicit preemption of

---

[1] Although the phrases "exemplary damages" and "punitive damages" are often used interchangeably, it is clear that they are two different forms of damages based on the wording of Section 3294, one is "for the sake of example" (i.e., to stave off future wrongdoings by others) and the other is "by way of punishing the defendant."



the general punitive damage statute of Section 3294, its use of the word "may" also makes it clear that it is merely an optional provision for the court to take. Such an optional clause should not in any way override the long- established law of letting the jury decide the amount of punitive damages in trade secret cases where jury trial is requested on all issues of facts. In fact, such has been a generally accepted practice. *See, e.g., Vacco Indus., Inc. v. Van Den Berg,* 5 Cal. App. 4th 34, 54 (1992) (jury awarded punitive damages for trade secret misappropriation).

Therefore, the correct reading of Section 3294, 3426.3(c) and 3426.7(a) should be that, while the jury may decide punitive damages under the criteria set forth in Section 3294 (i.e., "defendant has been guilty of oppression, fraud or malice"), the court may also impose exemplary damages under the standard of Section 3426.3(c) (i.e., "willful and malicious misappropriation exists"), regardless of the jury decision. This is consistent with the Ninth Circuit's ruling in *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1111–12 (9th Cir. 2001) where the court reversed the district court decision not to impose exemplary damages under Montana's Uniform Trade Secret Act ("MUTSA") based on the jury's finding of no punitive damages. The decision is hinged on the finding that MUTSA supersedes Montana's common law remedies because an explicit provision that states "this part displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." *Id.* at 1112, discussing Mont. Code Ann. § 30-14-408. In contrast, CUSTA takes just the opposite approach on this matter, making it clear that the traditional tort remedies are not superseded. *Cf.* Cal. Civ. Code § 3426.7(a) & Mont. Code Ann. § 30-14-408(1).

During the trial, the Court decided not to submit the amount of punitive damages to the jury over Citcon's objection and reserved the issue for the Court to decide via post-trial briefing. Although Citcon reserves its right to remedy this matter[2], at this stage of the case, Citcon requests that the Court determine the punitive damage under Section 3294 pursuant to the jury verdict as well as an exemplary damage under Section 3426.3(c).

### B.   Citcon Requests Punitive and Exemplary Damages of $3 Million

The jury rendered the following verdict related to punitive damages:

---

[2] Citcon does not waive its right to file a motion for new trial under FRCP 59, which is to be filed no later than 28 days after the entry of judgment, on any issues in this case. Nor does Citcon waive its right to appeal on any issues.

Has Citcon proved by clear and convincing evidence that RiverPay, Hua, or Shi acted with malice, oppression, or fraud in committing trade secret misappropriation of source code (Circle all that apply).

a. RiverPay [circled]

b. Yue "York" Hua [not circled]

c. Kenny Shi [not circled]

ECF 487 at 6.

Thus, at the very least, a punitive damage should be assessed against RiverPay based on Section 3294, which has no explicit 2x limit as Section 3426.3(c) as long as the punitive damages bear "a reasonable relation to actual damages." *Brewer v. Second Baptist Church of Los Angeles*, 32 Cal. 2d 791, 802 (1948).

The Court should also assess exemplary damages against RiverPay pursuant to Section 3426.3(c) for willful and malicious misappropriation. Unlike for determining punitive damages under the common law, the exemplary damages under CUTSA and DTSA does not require the use of clear and convincing standard. *See Yeti by Molly, Ltd..,* 259 F.3d at 1111 (finding it a legal error for the district court to use the clear and convincing standard for determining exemplary damages and attorney fees under Montana's Uniform Trade Secret Act). In any event, the evidence for willful and malicious misappropriation by RiverPay in this case is overwhelming.

### 1. RiverPay and Hua Willfully and Maliciously Misappropriated Citcon's Source Code Trade Secrets

There is ample evidence that RiverPay's source code was essentially copied from Citcon's source code because they are either identical or substantially identical. *See* TT at 592:11-596:2 (Sirovica testimony); Ex. A (Sirovica Slides 43-48)[3]; TX 332-454, 455-456 (Citcon's & RiverPay's source code). Defendants York Hua testified under oath that he did not dispute with Dr. Sirovica's opinion that RiverPay's code was "identical" or "substantially identical" to Citcon's code although he claimed Dino Lab owned Citcon's code. TT at 841:10-17. There is substantial evidence showing that York Hua took Citcon's source with a deliberate design based on his half-baked knowledge of the law:

---

[3] The demonstratives references in the brief are attached as exhibits to the brief for the convenience of the Court.



- Hua was familiar with the "IP" law that requires signature to assign "IP." TT 135:12-15 (Pipkin). The "IP" here obviously refers to the copyright law which Mr. Hua might have mistaken as the universal law for all IPs.

- Hua intentionally avoided signing Dino Lab's consulting agreement (i.e. , TX 468) when Dr. Huang asked him to do so, claiming he would ask a "partner," Tony Zhang, to sign it. TT at 230:22-232:18 (Huang).

  - Tony Zhang turned out to be an employee of Dino Lab who had been just hired around the time, May 2016. TT at 857:1-6 (Hua).

  - Dino Lab was, and still is, owned by three men: York Hua, Ryan Zheng and Simon Han. TT at 742:13-17 (Han).

  - When he was negotiating the contract with Dr. Huang, Hua represented that he had the full authority to enter into a contract on behalf of Dino Lab. TT at 232:1-18 (Huang).

- Hua concealed the stealing of the code while he was Citcon's employee:

  - The code theft happened initially in September 2016 and then again in February 2017. TT at 619:9-623:23 (Sirovica); Ex A (Sirovica Slide 58). Both thefts had happened before Hua resigned from Citcon on June 8, 2017. TT at 899:12-16 (Hua).

  - Before Hua's resignation from Citcon, RiverPay had signed investment agreements likely by leveraging the stolen source code. TX 23 & 24 (contracts requiring the investment companies to pay RiverPay "on or about March 31, 2017"); TX 25 (the investment must be paid "on or about May 23, 2017"). Simon Han's claim that the dates on the contracts were typos is not credible because no investment bankers would sign a contract requiring him to pay money on a date before his signature which would mean immediate breach upon signing.

  - By April 1, 2017, which was more than 2 months before Hua's resignation from Citcon, RiverPay had started generating revenue as shown in TX 284, p.



115; see Ex. B (Citcon's closing slide 13) and TT at 1468:3-1469:16 for explanation.

- o Therefore, contrary to what Hua told the jury that he was not involved with RiverPay until he left Citcon, the misappropriation happened when Hua was still Citcon's manager.

- o Simon Han and Ryan Zheng (two majority shareholders of Dino Lab) registered RiverPay in early 2017. TT at 744:8-10 (Han). A few months later, Hua resigned from Citcon and immediately became a co-founder and the majority shareholder of RiverPay. TX 16 (cf. Hua's 53.22% of RiverPay with Han and Zheng's 19.27%).

- o Hua's claim that he was given 53.22% of RiverPay by Zheng and Han because he could raise investment money is not credible because the investors who put in the real money only got a small portion of pie. *See* TX 16 (investors receiving from  of RiverPay). Hua essentially claims that his "finder's fee[4]" was much bigger than the actual investment received by RiverPay, which is a preposterous claim.

- o The real reason that Hua received the founder status and the majority shares of RiverPay was his contribution of the stolen source code from Citcon which was the foundation of RiverPay from early 2017 when Hua was still Citcon's manager.

- York Hua lied under oath about the $5,000 per month additional salary from Citcon as "licensing fee" for Dino Lab.

  - o <u>TT at 357:13-360:25</u> (Huang's explanation of the $5,000 consulting fee).

  - o <u>TX 103 at DEF000091</u> (showing the $5,000 per month as "General Consulting Fee ($5,000 USD)").

  - o <u>TT at 1037:11-1044:25</u> (Hua's inability to explain away the basic facts

---

[4] "Finder's fee" is "a commission paid to an intermediary or the facilitator of a transaction" ranging from "5% to 35% of the total value of the deal." https://www.investopedia.com/terms/f/finders-fee.asp.

regarding the $5,000 monthly payment).

- York Hua lied under oath about Citcon's launch of the Payment Engine in June 2016 as only containing "coupon" functions, to support his fiction that Dino Lab wrote 99.99% of Citcon's code.
    - o Ex. C (TX 474, the development timeline of Citcon's payment engine).
    - o TT 154:4-156:4 (Huang explaining how All Union helped Citcon to come out with a prototype in late 2015).
    - o 157:15-25 (Huang describing the launch of the Payment Engine in mid-2016 shortly after Dino Lab joined in as a contractor).
    - o 159:17-161:12 (Huang explaining TX 316 dated August 2015 as "continually enhanc[ing] our payment engine to *add* the coupon …redemption ability").
    - o 161:22-162:13 (Huang explaining TX 319A dated October 2015 as showing the payment engine was very close to the prototype months before Dino Lab's involvement).
    - o TX 319A (email by All Union—a.k.a. Miteno—manager Zhang Tao dated October 18, 2015 discussing the payment engine's[5] product manual which "should contain at least two kinds of business: **1 payment**; **2. coupon** …" and requested help on the "procedures for the merchants to open a **Alipay/Wechat**/baidu payment account in the US.").
    - o TX 317 (emails dated May 2016 showing Citcon's pre-launch discussion of **Alipay** and Citcon's payment engine integration).
    - o TT 979:1-20 (Hua's false claim that ██████ launched in June 2016 was **all about coupon** and "**there was nothing about Alipay and Wechat Pay**"), which is directly contradicted by contemporary documents such as TX 317 and 319A, *supra*.
    - o  Thus, Citcon's version of the development history is supported by credible

---

[5] The payment engine had a Chinese name "Haiwai Gou (海外购）" at the time which literally means "Overseas Payment) but was loosely translated as "Global Sourcing" in this case. TT160:16-161:7.

testimony corroborated with contemporaneous documents; in contrast, Hua's version is supported only by his self-serving words that contradict the contemporaneous documents. *See also* <u>TT at 173:12-174:10</u> (Huang explaining in the period of overlap between All Union and Dino Lab when All Union was managing the code development project and when All Union had 10 engineers on the project as compared to Dino Lab's one); <u>TX 310</u> (emails showing All Union's Weiyi Yang managing the code development project in June 2016 during the All Union/Dino Lab overlap).

- York Hua carefully concocted the fiction that Dino Lab coded 99.99% of Citcon's source code by wiping out the SVN revision history which contained mostly All Union engineers' coding works by improperly migrating from SVN to Github with code only.

  - <u>TT at 211:13-214:3</u> (Huang discussing how Hua and Shi deliberately migrated Citcon's code from SVN to Github improperly without the revision history to wipe out the code contribution by All Union).

- Hua also delayed the start of the Github system substantially to make sure that no All Union engineer would appear on the Gitbut revision history.

  - <u>TX 313A</u> (Hua's email showing Citcon's plan to switch to Github in June 2016).

  - TX 143 (Git log showing was first committed into Githubon September 18, 2016, three months after the decision to switch to Github).

  - <u>TX 141</u> (Git log showing was first committed into Github on November 2, 2016, more than 4 months after the decision to switch to Github).

  - <u>TX 142</u> (Git log showing was first committed into Gitbut on June 1, 2017, which was nearly a year after the decision to switch to Github and 8 days before Hua quit Citcon.

- Hua likely planted "Siwei Yang Dino Lab 2015" into Citcon's pos_android as comments.



- o The long delay in uploading ▇▇▇▇. *See* TX 142, showing a delay of nearly a year). This delay not only excluded the contributions of All Union and other Citcon's engineers from Github (see above), it also gave Hua the time to plant comments into the code to provide false evidence for Dino Lab's ownership of the code.

- o While it is very difficult to alter the "commit" authorship in Github (<u>TT at 653:12-18</u>, Sirovica), "comments" in the code can be falsified easily without a trace (<u>TT at 652:20-653:11</u>, Sirovica).

- o The multiple "Siwei Y. Dino Lab 2015" (e.g., TX 414 at 1) were fabricated comments. Siwei Yang did not start to show up on Dino Lab's invoices until September 2016. <u>TX 103</u> ("Siwei Y" first appearing on Dino Lab's invoices in September 2016); <u>TT at 1047:6-1048:8</u> (Hua agreeing that Siwei Yang first appeared on Dino Lab's invoice in September 2016). During his deposition, Hua never mentioned Siwei Yang working for Dino Lab in 2015 when he was asked the question. <u>TT at 1045:16-1046:17</u>. In his first meeting with his expert, Nick Ferrara, several years after he had left Citcon, Hua made sure to ask Ferrara to pay attention to "Dino Lab 2015" in Citcon's code. <u>TX 148 at 1</u> (Ferrara's meeting notes indicating that he was alerted to the "clear reference" to "Dynolab 2015" in Citcon's code).

- • Hua also likely fabricated the Spay code on which he relied heavily at trial for the false claim of Dino Lab's ownership of Citcon's code.

  - o In his first meeting on April 2, 2019 with his expert (which was nearly a year after the filing of this suit), York Hua did not mention anything either about the Spay repository or Smoothpay. TX 148.

  - o During that first meeting on April 2, 2019, when he was asked about whether Dino Lab had any repository to prove its past work, Hua responded there was not any repository before 2018. TX 148 at 1 ("Before 2018, when York was

only developer, it was just flat files."[6]). In response, Ferrara expressed his concern that there might "be a problem then figuring out what was 'past Dynolab work'". TX 148 at 1.

○ Twenty-five days after that first meeting, on April 27, 2019, Mr. Ferrara received the Spay repository from defense counsel as well as the first mention of "Smoothpay." TT at 1147:10-23.

○ The purported Spay repository, which purportedly dates back to 2013, was the very thing that Hua told Ferrara did not exist during their first meeting on April 2, 2019 when he told Ferrara that it was just flat files without any repository before 2018. TX 148.

○ Dr. Sirovica testified about the code evidence showing why Spay is likely a forgery. Ex. A (Sirovica Slide 34) (illustrating the likelihood that Spay was actually copied from Citcon's code); Slide 33 (summarizing the facts regarding how Citcon's code changed from ▓▓▓▓▓▓▓▓▓ ▓▓▓ in February 2017 which was copied into Spay); TT at 597:22-619:9 (Sirovica explaining his slides 34 and 33). Dr. Sirovica opined that it was likely that the dates of Spay had been altered which was very easy to do. TT at 617:7-20.

Therefore, there is ample evidence supporting not only the jury's finding by a clear and convincing evidence that RiverPay (through Hua) has acted with malice, oppression or fraud, but also a finding by a preponderance of evidence of willful and malicious misappropriation by RiverPay and Hua to justify an award of exemplary damages by this Court under Cal. Civ. Code § 3426.3(c).

### 2. The Amount of the Punitive and Exemplary Damages

There are three factors to be considered in awarding punitive or exemplary damages for deterrence purposes:

> One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility,

---

[6] "flat files" are opposite to "repository," having no revision history recorded therein.



> and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small. Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence, will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter.

*Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 928 (1978)

Regarding the nature of the wrongdoing, California courts have considered five factors:

> To determine if, and to what extent, misconduct is reprehensible, courts must consider whether: (1) the misconduct caused physical harm; (2) the misconduct disregarded the health or safety of others; (3) the misconduct targeted a financially vulnerable party; (4) the misconduct was repeated; and (5) the harm resulted from intentional malice, trickery, or deceit, or mere accident.

*Mattel, Inc. v. MGA Entm't, Inc.*, 801 F. Supp. 2d 950, 953–54 (C.D. Cal. 2011).

In *Mattel,* the Court held that "economic misconduct ... marked not just by malice, but a breach of basic commercial ethics and fraud" was reprehensible and deserved maximum punitive damages for trade secret misappropriation. *Id.* at 954. *Mattel* noted that "exemplary damages have been awarded in cases involving economic loss at ratios much higher than the 2:1 ratio MGA seeks," *id.* at 954, which is the also the ratio that Citcon seeks in this case. Hua's conduct for the benefit of RiverPay in this case, as discussed above, is not simply a lapse of judgment, but a willful and intentional design to misappropriate Citcon's source code with a high degree of malice. It is certainly more egregious than the conduct involved in Mattel where maximum exemplary damages were justified.

Regarding the size of the compensation award, it "refers to the relationship between the compensatory damages award and the proposed exemplary award." Under the 9th Circuit law, "a proper exemplary damages award can equal four times the compensatory damages award" although "extremely high ratio" may be reasonable in special cases. *Id.* at 955. That means the 2:1 ratio of exemplary to compensatory damages requested by Citcon is very reasonable.

Regarding the factor of net worth, courts have rejected the 10% ceiling rule. *See Bankhead v. ArvinMeritor, Inc.,* 205 Cal. App. 4th 68, 83 (2012) (rejecting the 10% net worth limit and affirming



punitive damages award of $4.5 million amounting to 37.5% of the defendant's net worth). "Although net worth is the most common measure of the defendant's financial condition, it is not the only measure for determining whether punitive damages are excessive in relation to that condition." *Rufo v. Simpson*, 86 Cal. App. 4th 573, 624 (2001) (affirming punitive damages that exceeded 100% of the defendant's net worth); see also *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.*, 155 Cal.App.3d 381 (1984) (affirming a punitive damages award that was 17.5 percent of the defendant's net worth); *Vallbona v. Springer*, 43 Cal.App.4th 1525 (affirming a punitive damages award which was 23% of defendants' net worth).

In this case, for 2018, RiverPay's revenue was about $6.2 million and its assets was about $7.5 million according to an audited financial report. TX 76 at 5 & 3. RiverPay has never produced its 2019 financial results or reports other than a one-page printout which purportedly was its revenue figures for the first 3 quarters of 2019, without any substantiation. TX 1176. The figures on the report are very different from the figures given by York Hua. In his deposition in May 2019, Hua testified that the forecasted revenue of RiverPay for 2019 should be $30-100 million. TT at 1003:1-5. At the time, Mr. Hua had at least the first four months of 2019 performance available which should be $10-33.33 million to justify his projection of $30-100 million for the year. Yet, TX 1176 shows the revenue for the first four months of 2019 being about $6 million, far below the $10-33.33 million data that Hua must have relied on to give the $30-100 million projection for the year in May 2019. Further, the data after April in TX 1176 decline precipitously causing the 2019 revenue to be just over $10 million. See Ex. D (Persechini Slide 10). TX 1176 is likely doctored data created for the trial for the purpose of cutting down the damages. The actual revenue of RiverPay for 2019 is likely to be much higher than $10 million shown by TX 1176. Given the egregiousness of RiverPay's action in this case and its asset and revenue figures, an exemplary damages award of $3 million is justified.

## II. JOINT AND SEVERA LIABILITY OF DEFENDANTS RIVERPAY AND HUA

During the trial, the Court denied Citcon's request to submit the issue of joint and several liability of the defendants for misappropriation of trade secrets to the jury. This issue, however, can be decided by this Court post-verdict, because it does not involve any determination of facts and can be determined as a matter of law.

Trade secret misappropriation is an intentional tort for which joint tortfeasors are jointly and severally liable. *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1217–18 (N.D. Cal. 2012). The joint liability does not change when the compensatory award is unjust enrichment by one joint tortfeasor. *Fishkin v. Susquehanna Partners, G.P.*, No. CIV.A.03-3766, 2007 WL 853769, at *2–3 (E.D. Pa. Mar. 19, 2007) (rejecting defendants' argument against joint and several liability simply because the misappropriation award was unjust enrichment by one defendant). This law makes sense especially in this case. RiverPay as a corporation can only commit the misappropriation through Mr. Hua. Although Hua's joint liability with RiverPay should not be affected by whether any compensatory award has been assessed against him, the fact that Hua was assessed zero in this case makes it even more obvious that he should be jointly and severally liable with RiverPay for the damages assessed against RiverPay; otherwise, the main culprit would walk away liability free.

Thus, Hua should be held jointly and severally liable with RiverPay for misappropriating Citcon's source code trade secrets.

## III.   UNFAIR COMPETITION CLAIMS

Citcon has prevailed on one of the bases for its unfair competition claim, i.e., the conversion of POS device[7], thus judgment should be entered against Hua for Citcon's unfair competitor claim for a nominal award of $1.

RiverPay has not prevailed on any of its underlying claims for unfair competition. Thus, judgment should be entered for Citcon for RiverPay's unfair competition counterclaim.

## IV.   INJUNCTION

Both the federal and state law authorizes injunction to "prevent any actual or threatened misappropriation" Cal. Civ. Code § 3426.2; 18 U.S.C. § 1836(b)(30(A). As Defendant Hua readily admitted, RiverPay's source code is essentially a copy of Citcon's. Thus, any continued use of its source code by RiverPay would amount to "actual or threatened misappropriation" and thus should

---

[7] Citcon disagrees with this Court's broad view regarding preemption by CUTSA and reserves its right to appeal the dismissal of its claims for breach of fiduciary duty and unfair competition based on preemption. But the argument here is based on the Court's broad view of CUTSA preemption.



be enjoyed. *See DVD Copy Control Assn., Inc. v. Bunner*, 31 Cal. 4th 864, 879 (2003), as modified (Oct. 15, 2003) (injunction on use of misappropriated computer code is content neutral and does not implicated the constitutional right of free speech); *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (the world-wide injunction is not overbroad geographically).

For the standard of issuing permanent injunction, the discussions in *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. C 10-3428 PSG, 2013 WL 890126, at *2–3 (N.D. Cal. Jan. 23, 2013) are elucidating. In *Brocade*, the court concluded that Brocade had shown irreparable harm for the necessity of issuing the permanent injunction to preclude the defendant in that case from selling the products with the misappropriated trade secrets. *Id.* at *12.

This is a much easier case than *Brocade*. In *Brocade*, although the jury found A10 had misappropriated Brocade's trade secrets, there was no actual damages but only "nominal damages." *Id.* at *1. In contrast, not only did the jury find RiverPay and Hua had misappropriated Citcon's source code, they also awarded $1.5 million unjust enrichment damages to Citcon. The jury in this case also found malice in RiverPay's action. There is no dispute in this case that RiverPay is Citcon's direct competitor. It is also the jury's verdict that RiverPay's direct competition with Citcon was enabled by its software misappropriation from Citcon, as indicated by the $1.5 million unjust enrichment damages for misappropriating the code. Contrary to *Brocade* where it was debatable whether the trade secrets at issue remained secrets (*id.* at *4-8), there is no dispute here that both Citcon and RiverPay still guarded their source code as highly confidential information. Both parties designated their source code as the highest-level protection under the protective order, i.e., "Highly Confidential – Source Code," allowing only the other party to view the source code in counsel's office and printed only selected portion for trial evidence. Although the trial procedure was open to the public, there is little discussion of the actual code during the trial and the Court has ruled that not closing the courtroom during the presentation does not jeopardize the parties' confidentiality designation. ECF 420.

As *Brocade* acknowledges, "[c]ommercial advantage is grounds for finding irreparable harm under the CUTSA." *Brocade Commc'ns Sys., Inc.*, 2013 WL 890126, at *9, fn. 108, citing *Agency Solutions.Com LLC v. TriZetto Grp., Inc.,*819 F.Supp.2d 1001,1031 (E.D. Cal. 2011); *O2 Micro*



Case No. 17-CV-06520-NC

CITCON'S AND JIANG'S POST-VERDICT BRIEF

*Intern. Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1070 (N.D.Cal.2005). Unless an exorbitant and thus prohibitive amount of royalty is imposed on RiverPay (which would be equivalent to injunction), there is no compensation that is adequate for Citcon to justify licensing the source code to RiverPay to allow the latter to essentially eat its lunch using the exact system that Citcon had developed. In contrast to *Brocade*, which involved an assortment of trade secrets that had the nominal value of $1, the trade secrets at issue here are the highly valuable source code that enables the entire operation of RiverPay's payment system. Thus, irreparable harm here is more than in *Brocade*. The requested injunction should be granted.

As to the length of the injunction, it is clear that an injunction can be terminated if "[u]pon application to the court, an injunction shall be terminated when the trade secret has ceased to exist." Cal. Civ. Code § 3426.2(a). Thus, the law clearly contemplates a permanent injunction which shall last as long as the trade secrets still exist and shall only be terminated upon "application to the court." There is no question here the source code trade secrets are still trade secrets and will remain trade secrets. Thus, the injunction shall be permanent until Defendants can show the trade secrets do not exist through no fault of their own.

Because RiverPay's entire business is based on the source code at issue, there should be a injunction of the RiverPay's payment business for at least one year. After one year, the injunction on the business operation may be lifted only upon a showing by RiverPay that it has developed a new set of source code through a cleanroom process or otherwise.

Further injunction shall be granted to require RiverPay to return and destroy all its source code, and not to disclose the source code trade secrets to others.

The exact wording of the injunction are proposed in the proposed judgment.

## V.     ATTORNEYS' FEES AND COSTS

### A.     Citcon Should Recover Its Fees and Costs for Prosecuting the Source Code Misappropriation Claim

Both CUSTA and DTSA allow the Court to award attorney's fees if the misappropriation is found to be "willful and malicious." Cal. Civ. Code § 3426.4; 18 U.S.C. §1836(b)(3)(D). That requirement is satisfied here by the jury's determination that RiverPay was found to have



misappropriated Citcon's source code with malice, oppression, or fraud under a clear and convincing evidence standard. ECF No. 487 at 6:13-16; *see Vacco Indus.,* 5 Cal. App. 4th at 54 (This [jury] finding was necessary to the award of punitive damages which was made by the jury. However, it is also sufficient to justify the statutory portion of the fee award").

As discussed above in the context of punitive damages, there is sufficient evidence for a finding of willful and malicious misappropriation against RiverPay and Hua by a preponderance of evidence. *See* Sec. I (B)(1), pp. 3-9, *supra*. There is seldom, if ever, a case where the Court did not award attorney's fees after a finding of willful and malicious misappropriation. To the contrary, there are many cases that award sizable attorney fees upon a finding of willful and malicious misappropriation. *See, e.g., Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*, 226 Cal. App. 4th 26, 71 (2014) (awarding $3,297,102.50 attorney's fees pursuant to section 3426.4); *Mattel, Inc.*, 801 F. Supp. 2d at 958 (awarding $ 2,172,000 attorney's fees); *PQ Labs, Inc. v. Yang Qi*, No. 12-0450 CW, 2014 WL 4954161, at *13 (N.D. Cal. Sept. 30, 2014) (awarding attorney fees but order the plaintiff to file a motion to ascertain the amount of the fees).

In this case, we request that the Court use the *PQ Labs* approach, i.e., issuing the judgment with the attorney fee award while allowing Citcon to submit a motion for determining the amount of the fees pursuant to FRCP 54(d)(2) and Civ. L.R. 54-5.

### B.   Citcon Should Recover Taxable Costs for the Case as the Prevailing Party

Under Rule 54(d)(1), the prevailing party "should be allowed" to recover taxable costs. "A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791(1989) (citing Congressional Report indicating that the prevailing party is a party who "has prevailed on an important matter in the course of litigation, even when he ultimately does not prevail on all issues"); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1015 (7th Cir. 1985) ("under Rule 54(d) the 'prevailing party' is the party who prevails as to the substantial part of the litigation.").

"The fact that a party does not prevail on all of its claims does not … preclude it from being the prevailing party for purposes of awarding costs under Rule 54(d)." *Texas State Teachers Ass'n v.*

*Garland Indep. Sch. Dist.*, 489 U.S. 782, 790 (1989) (affirming plaintiff as the prevailing party despite the fact that it only succeeded on one of two infringement claims it asserted).

In this case, there is no reasonable dispute that Citcon has prevailed on "an important matter" of the litigation, i.e., the misappropriation of source code claim. Almost all discovery efforts and most of the trial time were devoted to this issue.

Nor is there any dispute that Citcon has prevailed on "the substantial part of the litigation," in light of its victory on the source code misappropriation claim and its complete victory on RiverPay's counterclaims. The fact that Citcon lost on Shi's counterclaim should not affect Citcon's prevailing party status because it is a minor claim that cannot be even apportioned any significant costs incurred for the case.[8]

Thus, Citcon should be declared the prevailing party in this case and taxable cost for the entire case should awarded to Citcon.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Citcon respectfully request the Court to enter judgment as proposed by Citcon.

Respectfully Submitted,

**LiLaw Inc.**

Dated: January 10, 2020

By:/s/J. James Li____
J. James Li, Ph.D.

Attorneys for Plaintiff Citcon USA LLC and Counter-Defendants Citcon USA LLC and Wei Jiang

---

[8] Citcon reserves the right to seek a new trial on Shi's liability and his breach of contract claim. Citcon believes that the 15-hour time limit was unduly restrictive to its presentation of the claims and defenses, in light of the multiple claims and counterclaims in this case. Because of the time constraint and Citcon's need to ensure a proper presentation of its main claim, Citcon had to sacrifice its presentation on Shi's counterclaims. For example, Citcon has to forego Frank Wang's video evidence regarding Shi's culpability in creating and concealing the Dropbox account. Citcon also has very little time for cross-examining Mr. Shi on the matter and had nearly no time during the closing to talk about the evidence of Shi's wrongdoings in connection with the Dropbox account.  Citcon believes that if it had an extra 3 hours for the trial, Shi would have been found liable for wrongdoings that would have triggered the forfeiture clause to defeat Shi's counterclaim.



# Exhibit A

Portion Filed Under Seal

HIGHLY CONFIDENTIAL – SOURCE CODE

# Illustrations for Expert Testimony of Dean Sirovica, Ph.D.

TX 800

CONTAINS INFORMATION DESIGNATED AS HIGHLY CONFIDENTIAL-SOURCE CODE

HIGHLY CONFIDENTIAL – SOURCE CODE



➢ Citcon's change from ▮▮▮▮▮▮▮▮▮▮▮▮

| Feb. 8 | Shi told Miao that he had a project for "▮▮▮▮▮▮▮ … ▮▮▮▮▮▮▮▮▮▮" waiting for Miao when he finished his tasks |
|---|---|
| Feb. 10 | • Miao finished his tasks and asked Shi for new assignments<br>• Shi assigned Miao the project of ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮" and suggested to Miao to use "a ▮▮▮▮▮▮" of the "▮▮▮▮▮▮▮▮▮" approach.<br>• Miao replied that "▮▮▮▮▮▮▮▮▮▮ way to go" and he "will get started on it." |
| Feb. 20 | Miao committed a code change to ▮▮▮▮ with the log "▮▮▮▮▮▮▮▮▮▮" |
| Feb. 21 | Miao Miao committed a code change to ▮▮▮▮ with the log "▮▮▮▮▮▮▮▮▮▮" |

33

HIGHLY CONFIDENTIAL – SOURCE CODE



HIGHLY CONFIDENTIAL – SOURCE CODE

## 2. RiverPay stole Citcon's core logic code files

Core Logic Files (TX480)

| Ref. # | Core Logic | Function |
|--------|-----------|----------|
| 1 | (TX 332) | |
| 2 | (TX 336) | |
| 3 | (TX 338) | |
| 4 | (TX 342) | |
| 5 | (TX 346) | |
| 6 | (TX 351) | |
| 7 | (TX 353) | |
| 8 | (TX 355) | |
| 9 | (TX 357) | |

43

HIGHLY CONFIDENTIAL – SOURCE CODE

## 2. RiverPay stole Citcon's core logic code files ▓▓▓

▓▓▓ → T-shipped ▓▓▓

| Ref. # | Citcon (▓▓▓, 9/18/2016) | RiverPay (t-shipped, 6/20/2017) | Comparison |
|---|---|---|---|
| 1 | ▓▓▓ (TX 332) | ▓▓▓ (TX 333) | Nearly identical |
| 2 | ▓▓▓ (TX 336) | ▓▓▓ (TX 337) | Identical |
| 3 | ▓▓▓ (TX 338) | ▓▓▓ (TX 339) | Identical |
| 4 | ▓▓▓ (TX 342) | ▓▓▓ (TX 343) | Nearly identical |
| 5 | ▓▓▓ (TX 346) | ▓▓▓ (TX 348) | Nearly identical |
| 6 | ▓▓▓ (TX 351) | ▓▓▓ (TX 352) | Largely identical |
| 7 | ▓▓▓ (TX 353) | ▓▓▓ (TX 354) | Copying of key functions |
| 8 | ▓▓▓ (TX 355) | ▓▓▓ (TX 356) | Largely identical |
| 9 | ▓▓▓ (TX 357) | ▓▓▓ (TX 358) | Substantial copying |

HIGHLY CONFIDENTIAL – SOURCE CODE

## 2. RiverPay stole Citcon's core logic code files

### Core Logic Files (TX481)

| Ref. # | Mobilepay Core Logic | Function |
|--------|----------------------|----------|
| 1 | (TX 359) | |
| 2 | (TX 361) | |
| 3 | (TX 363) | |
| 4 | (TX 367) | |
| 5 | (TX 371) | |
| 6 | (TX 374) | |
| 7 | (TX 376) | |
| 8 | (TX 378) | |
| 9 | (TX 382) | |
| 10 | (TX 387) | |
| 11 | (TX 391) | |
| 12 | (TX 395) | |
| 13 | (TX 397) | |
| 14 | (TX 401) | |

HIGHLY CONFIDENTIAL – SOURCE CODE

## 2. RiverPay stole Citcon's core logic code files

███████████ → Onlinepay

| Ref. # | Citcon ███████ 11/2/2016) | RiverPay (Onlinepay, 6/20/2017) | Comparison |
|---|---|---|---|
| 1 | ███████████ (TX 359) | ████████████ (TX 360) | Identical |
| 2 | ██████████ (TX 361) | ███████████ (TX 362) | Nearly identical |
| 3 | ████████ (TX 363) | █████████ (TX 364) | Nearly identical |
| 4 | ████████ (TX 367) | █████████ (TX 368) | Nearly identical |
| 5 | ████████ (TX 371) | █████████ (TX 373) | Largely identical |
| 6 | █████████████ (TX 374) | ████████████ (TX 375) | Substantial copying |
| 7 | ██████ (TX 376) | ████████ (TX 377) | Identical |
| 8 | ██████ (TX 378) | ██████ (TX 379) | Largely identical |
| 9 | ████████ (TX 382) | ████████ (TX 384) | Substantial copying |
| 10 | ███████ (TX 387) | █████████ (TX 388) | Nearly identical |
| 11 | ████████ (TX 391) | ████████ (TX 392) <br> utils.php (TX 405) | Citcon's code copied into two files |
| 12 | ████████████ (TX 395) | ████████████ (TX 396) | Nearly identical |
| 13 | ██████████ (TX 397) | ██████████ (TX 398) | Identical |
| 14 | ██████████ (TX 401) | █████████ (TX 402) | Identical |

46

## 2. RiverPay stole Citcon's core logic code files

### Core Logic Files #1-12 (TX482-A)

| Ref. # | Core Logic | Function |
|--------|------------|----------|
| 1  | (TX 406) | |
| 2  | (TX 408) | |
| 3  | (TX 410) | |
| 4  | (TX 412) | |
| 5  | (TX 414) | |
| 6  | (TX 416) | |
| 7  | (TX 418) | |
| 8  | (TX 420) | |
| 9  | (TX 422) | |
| 10 | (TX 424) | |
| 11 | (TX 426) | |
| 12 | (TX 428) | |

47

HIGHLY CONFIDENTIAL – SOURCE CODE

## 2. RiverPay stole Citcon's core logic code files

### �_____ (#1-12) → Pos_Enterprise(#1-12)

| Ref. # | Citcon _____, 6/1/2017) | RiverPay (pos_enterprise, 6/20/2017) | Comparison |
|--------|--------------------------|--------------------------------------|------------|
| 1 | (TX 406) | (TX 407) | Substantial copying |
| 2 | (TX 408) | (TX 409) | Largely identical |
| 3 | (TX 410) | (TX 411) | Nearly identical |
| 4 | (TX 412) | (TX 413) | Substantial copying |
| 5 | (TX 414) | (TX 415) | Substantial copying |
| 6 | (TX 416) | (TX 417) | Nearly identical |
| 7 | (TX 418) | (TX 419) | Substantial copying |
| 8 | (TX 420) | (TX 421) | Nearly identical |
| 9 | (TX 422) | (TX 423) | Nearly identical |
| 10 | (TX 424) | (TX 425) | Largely identical |
| 11 | (TX 426) | (TX 427) | Substantial copying |
| 12 | (TX 428) | (TX 429) | Substantial copying |

48

HIGHLY CONFIDENTIAL – SOURCE CODE



# Exhibit B



# Exhibit C

Filed Under Seal

# Exhibit D

Portion Filed Under Seal

# Revenue Benefit
## 2019 Revenue

TX 801-**10**

**Take Average Monthly Revenue Jan-Sep**



(TX1176)

### Fact Bases

- Revenue from "Processing" and "Gift card" for Jan-Sep 2019: ▮▮▮▮▮▮, assume Oct-Dec revenue equals average monthly revenue of ▮▮▮▮▮ (TX1176)

- Extrapolate to 12-month 2019 revenue of ▮▮▮▮▮