JAMES McMANIS (40958)
ELIZABETH PIPKIN (243611)
CHRISTINE PEEK (234573)
CHRISTOPHER ROSARIO (326436)
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:     (408) 279-8700
Facsimile:     (408) 279-3244
Email:          epipkin@mcmanislaw.com

Attorneys for defendants and
counter-claimants, RiverPay Inc.,
a Canadian corporation, RiverPay, Inc.,
a Delaware corporation, and Kenny E Shi,
and defendant Yue ("York") Hua

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITCON USA LLC,<br><br>            Plaintiff,<br><br>      v.<br><br>RIVERPAY INC., a Canadian corporation,<br>RIVERPAY, INC., a Delaware corporation,<br>YUE HUA, a.k.a., YORK HUA, an individual,<br>KENNY E SHI, an individual, and DOES 1<br>through 20,<br><br>            Defendants. | Case No. 5:18-cv-02585-NC<br><br>**DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW; BRIEFING ON PUNITIVE DAMAGES**<br><br>**[Fed. R. Civ. P. 52; ECF 489, 492]**<br><br>**Trial Date**:     December 9, 2019<br>**Time**:          9:00 a.m.<br>**Ctrm**:          7, 4th Floor<br>**Judge**:         The Hon. Nathanael Cousins |
| RIVERPAY INC., a Canadian corporation,<br>RIVERPAY, INC., a Delaware corporation,<br>and KENNY E SHI, an individual,<br><br>            Counter-Claimants,<br><br>      v.<br><br>CITCON USA, LLC, a California limited<br>liability company, WEI JIANG, an individual,<br>and DOES 1 through 20,<br><br>            Counter-Defendants. | |

**TABLE OF CONTENTS**

PROPOSED FINDINGS OF FACT ......................................................................... 1

    I.    Trade Secret Remedies ......................................................................... 1

        A.    Plaintiff Failed to Produce Evidence of Entitlement to a
                Reasonable Royalty or of the Amount .................................................. 1

        B.    The Evidence Does Not Support an Award of Punitive
                Damages against Any Defendant ......................................................... 3

        C.    The Evidence Does Not Support Entry of an Injunction ....................... 6

    II.    Citcon's UCL Claim Based on Alleged Conversion of a POS Device ................ 7

    III.    RiverPay's UCL Claim ................................................................................. 7

PROPOSED CONCLUSIONS OF LAW ..................................................................... 10

    I.    Trade Secrets Remedies ............................................................................. 10

        A.    Plaintiff Is Not Entitled to Any Reasonable Royalty ............................ 10

        B.    Plaintiff Is Not Entitled to Punitive Damages .................................... 13

        C.    Plaintiff Is Not Entitled to an Injunction ........................................... 18

    II.    Plaintiff Is Not Entitled to Any Remedies on Its UCL Claim Based
        on Conversion of a POS Device .......................................................... 21

    III.    RiverPay's UCL Claim ................................................................................. 22

MEMORANDUM OF POINTS & AUTHORITIES ON PUNITIVE DAMAGES
FOR PLAINTIFF'S TRADE SECRETS CLAIM ....................................................... 25

    I.    Factors the Court Must Consider in Deciding Whether to Award
        Punitive Damages ............................................................................. 25

    II.    The Verdict and Evidence Do Not Support Exemplary or Punitive
        Damages under CUTSA or the DTSA .................................................. 27

    III.    The Verdict and Evidence Do Not Meet California Statutory
        Requirements for Punitive Damages against a Corporation ............................ 28

    IV.    The Court Should Decline to Exercise Its Discretion to Award
        Punitive Damages, because the Evidence of RiverPay's Net Worth
        Shows It Is Unable to Pay Punitive Damages .................................... 30

i

A.    The Court Must Consider RiverPay's Ability to Pay ........................... 30

B.    The Evidence Shows the RiverPay Entities Are Unable to
Pay Punitive Damages .......................................................................... 31

V.    The Court Should Decline to Exercise Its Discretion to Award
Punitive Damages, because Such An Award Would Not Meet
Constitutional Standards ................................................................................... 33

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*Ackerman v. W. Elec. Co., Inc.*, 860 F.2d 1514 (9th Cir. 1988) .................... 25

4

*Adams v. Murakami*, 54 Cal. 3d 105 (1991) ..................................... 16, 30

5

*Alexander v. Incway Corp.*, 633 Fed. App'x 472 (9th Cir. 2016) .................... 31

6

*Allied Erecting and Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, No. 4:06CV114, 2010
7      WL 3370286 (N.D. Ohio Aug. 26, 2010) ......................................... 19, 20

8

*Baxter v. Peterson*, 150 Cal. App. 4th 673 (2007) ................................. 16, 31

9

*Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172 (C.D. Cal. 2011) .............. 26, 27

10

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, No. 5:15-cv-01370-EJD, 2019 WL 1117537
11      (N.D. Cal. Mar. 11, 2019) ..................................................... 18, 19

12

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ................... 17, 18, 33, 34

13

*Bondanza v. Peninsula Hosp. & Med. Ctr.*, 23 Cal. 3d 260 (1979) ................... 23

14

*Boyle v. Lorimar Prods.*, 13 F.3d 1357 (9th Cir. 1994) ............................ 16, 31

15

*Cel-Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ......... 21, 22, 23

16

*Cortez v. Purolator Air Filtration Prods Co.*, 23 Cal. 4th 163 (2000) ................. 21

17

*Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039 (N.D. Cal. 2010) ............... 26, 35

18

*Cruz v. HomeBase*, 83 Cal. App. 4th 160 (2000) ............................... 14, 28, 29

19

*CVD, Inc. v. Raytheon Co.*, 769 F.2d 842 (1st Cir. 1985) ........................ 19, 23

20

*Davis v. Farmers Ins. Exch.*, 245 Cal. App. 4th 1302 (2016) ...................... 21

21

*Davis v. Kiewit Pac. Co.*, 220 Cal. App. 4th 358 (2013) ......................... 14, 28

22

*Duste v. Chevron Prods. Co.*, 738 F. Supp. 2d 1027 (N.D. Cal. 2010) ................ 21

23

*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697 (2009) ............... 18

24

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ......................... 19, 22

25

*EnerTrode, Inc. v. General Capacitor Co. Ltd.*, No. 16-cv-02458-HSG, 2019 WL 1715170
26      (N.D. Cal. April 17, 2019) ..................................................... 17, 24, 34

27

*Flores v. City of Westminster*, 873 F.3d 739 (9th Cir. 2017) ...................... 17, 34

28

DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW; BRIEFING ON PUNITIVE DAMAGES; Case No. 5:18-cv-02585-NC

*Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971) ........................ 11

*Grail Semiconductor, Inc. v. Mitsubishi Elec. & Elecs. USA, Inc.*, 225 Cal. App. 4th 786 (2014) ............................................................................................................. 19

*Hewlett v. Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499 (1997) ................................ 23

*Kelly v. Haag*, 145 Cal. App. 4th 910 (2006) ............................................................. 31

*Kenly v. Ukegawa*, 16 Cal. App. 4th 49 (1993) .......................................................... 31

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) ................. 21, 22

*Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011) .......................................... 22

*Lara v. Cadag*, 13 Cal. App. 4th 1061, 1064 (1993) .................................................. 31

*Larkin v. Home Depot, Inc.*, No. 13-cv-2868-LB, 2015 WL 1049716 (N.D. Cal. Mar. 9, 2015).................................................................................................... 14, 29

*Lucent Techs., Inc. v. Bd. of Equalization*, 241 Cal. App. 4th 19 (2015) .................... 20

*MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993)........................ 20

*Mattel, Inc. v. MGA Entertainment, Inc.*, 801 F. Supp. 2d 950 (C.D. Cal. 2011) ........... 13, 15, 25

*Michelson v. Hamada*, 29 Cal. App. 4th 1566 (1994) ...................................... 15, 26, 33

*Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910 (1978) ................................................... 30

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005), *amended on other grounds*, 420 F. Supp. 2d 1070 (N.D. Cal. 2006) ........................ 11, 15, 25

*Protectus Alpha Nav. Co., Ltd. v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379 (9th Cir. 1985)................................................................................................... 14, 28

*Robert L. Cloud & Assocs., Inc. v. Mikesell*, 69 Cal. App. 4th 1141 (1999) ........................ 26, 30

*Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112 (Fed. Cir. 1996) .......................... 25

*Sampson v. Murray*, 415 U.S. 61 (1974) ............................................................... 19, 20

*Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006)............................................... 23, 30

*Soto v. BorgWarner Morse TEC Inc.*, 239 Cal. App. 4th 165 (2015)........................... 16, 30, 31

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ......................... 17, 34

*Sterling Cross Def. Sys., Inc. v. Dolarian Capital, Inc.*, No. 1:13-cv-01773 AWI EPG,

DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW; BRIEFING ON PUNITIVE DAMAGES; Case No. 5:18-cv-02585-NC

2015 WL 12697065 (E.D. Cal. Dec. 24, 2015) ..................................................... 15, 26, 33, 35

*Stewart Title Guar. Co. v. 2485 Calle Del Oro, LLC*, No. 15-cv-2288-BAS-WVG, 2018 WL
3222610 (S.D. Cal. June 19, 2018).................................................................................. 26, 35

*Taiwan Semiconductor Mfg. Co., Ltd. v. Tela Innovations, Inc.*, No. 14-cv-00362-BLF,
2014 WL 3705350 (N.D. Cal. July 24, 2014)...................................................................... 14, 28

*TriPharma, LLC v. First Fruits Bus. Ministry*, No. SACV 12404 JVS (ANx), 2013 WL
12129386 (C.D. Cal. Apr. 2, 2013)........................................................................................ 27

*UCAR Tech. (USA) Inc. v. Yan Li*, No. 5:17-cv-01704-EJD, 2018 WL 2555429
(N.D. Cal. June 4, 2018) ........................................................................................................ 21

*United Farm Workers of America v. Dutra Farms*, 83 Cal. App. 4th 1146 (2000)..................... 23

*Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34 (1992)...................................... 16, 30

*Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142 (2d Cir. 1996) ......................... 10, 12

*Washington v. City Title Loan, LLC*, No. CV 16-5427 FMO AFMx, 2018 WL 4005447
(C.D. Cal. Feb. 26, 2018)........................................................................................................ 27

*Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443 (2002) ...................................................... 18

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)...................................... 18

**STATUTES**

18 U.S.C. § 1836(b)(3) ............................................................................................ 13, 25

18 U.S.C. § 1836(b)(3)(C) ......................................................................................... 13, 27

Cal. Bus. & Prof. Code § 17200 ...................................................................................... 21

Cal. Bus. & Prof. Code § 17204 ...................................................................................... 22

Cal. Bus. & Prof. Code § 17206(a)............................................................................. 18, 35

Cal. Civ. Code § 3294(b) ........................................................................................... 14, 28

Cal. Civ. Code § 3294(c)(1)........................................................................................ 14, 28

Cal. Civ. Code § 3426.3(b) ............................................................................................. 10

Cal. Civ. Code § 3426.3(c) ......................................................................................... 13, 25

Civil Code § 3426.3(c)................................................................................................ 13, 27

Fed. R. Evid. 201(b)......................................................................................................... 8

**PROPOSED FINDINGS OF FACT**

I. <u>**Trade Secret Remedies.**</u>

    A. **Plaintiff Failed to Produce Evidence of Entitlement to a Reasonable Royalty or of the Amount.**

1.    Plaintiff introduced no evidence of what a reasonable royalty would be for its source code.  Huang, 8 RT 1516:24-1519:17.

2.    The jury found that no defendant acquired or used plaintiff's asserted trade secrets in its transaction data.  *See* ECF 487, pp. 3-4 (section I, questions 6-8, 10).  The evidence is sufficient to support the jury's finding.

3.    The jury found that no defendant acquired or used plaintiff's asserted trade secrets in its business plans.  *See* ECF 487, pp. 3-4 (section I, questions 6-8, 10).  The evidence is sufficient to support the jury's finding.

4.    Chunbo Huang demanded 25% of processing revenue and 5% of gift card revenue as a reasonable royalty for *all* of plaintiff's "non-source code trade secrets."  Huang, 8 RT 1516:24-1518:3, 1518:19-1519:7.  By responding, "yes," to the following questions from plaintiff's counsel, Huang attempted to justify these numbers by asserting that *all* of defendants' processing and gift card revenue had been taken from plaintiff: "And basically they will be eating your lunch, right?  Every money they make will be taken from you; is that right?"  Huang, 8 RT 1519:5-7.

5.    Plaintiff introduced no evidence of actual royalties received by it or paid by defendants.  Huang, 8 RT 1516:24-1519:17.  Plaintiff had no royalty agreements when Hua was working there.  Hua, 8 RT 1520:1-3, 1520:16-1521:1.

6.    Plaintiff had no net profits in any year, from 2017 to 2019.  Huang, 8 RT 1518:8-11.

7.    Plaintiff introduced no evidence that it ever had revenues from gift cards.  Huang, 8 RT 1516:24-1519:17.  Plaintiff had no revenues from gift cards when Hua was working there, and still does not have a gift card product.  Hua, 8 RT 1520:12-15.

///

1    8.    Plaintiff introduced no evidence of the amount of its revenue (if any) or

2 defendants' revenue that is attributable to "POS Designs."  Huang, 8 RT 1516:24-1519:17.

3    9.    Plaintiff introduced no evidence of any reasonable royalty rate it might demand

4 for its claimed trade secret in "POS designs" alone.  Huang, 8 RT 1516:24-1519:17.

5    10.    Plaintiff purchases its POS devices from third-party vendors.  Huang, 3 RT 317:9-

6 15, Hua, 5 RT 890:20-892:11.

7    11.    Plaintiff failed to identify with specificity any POS device that allegedly had been

8 retained by Hua.  Huang, 2 RT 265:1-268:5; Huang, 3 RT 318:1-319:1.

9    12.    Plaintiff failed to identify the alleged trade secret in its "POS Designs" with

10 reasonable specificity at trial.  *See* Jury Note 48 ("Does POS design refer to the hardware <u>only</u> or

11 the data and/or software residing on POS device?"); *see also* 8 RT 1512:3-1516:8 (discussion on

12 Jury Note 48 outside the presence of the jury); Huang, 3 RT 394:23-395:2; Huang, 5 RT 770:6-

13 771:15, 774:24-775:7.

14    13.    There is no source code on plaintiff's POS devices, only compiled code, i.e.,

15 object code.  Huang, 5 RT 770:17-771:6.

16    14.    No code was loaded onto the POS devices Plaintiff sent to defendant Hua. Hua, 6

17 RT 986:10-987:13.

18    15.    Plaintiff introduced no evidence of how the POS devices interface with plaintiff's

19 server, or any particular functionality of the object code on the device that differs from the

20 pos_android source code files also claimed as a trade secret.  Huang, 3 RT 394:23-395:2; Huang,

21 5 RT 770:6-771:15, 774:24-775:7.

22    16.    Plaintiff introduced no evidence that Hua decompiled any object code from any

23 POS device owned by plaintiff, or that Hua did anything to obtain any information whatsoever

24 from the POS device he allegedly retained after his employment with plaintiff ended.  Huang, 3

25 RT 394:23-395:2; Huang, 5 RT 770:6-771:15, 774:24-775:7.

26    17.    Plaintiff's expert, Dr. Sirovica, did not include in his analysis code provided by

27 Google that supports functionality of the android system for the android-based POS systems used

28 by the parties.  Sirovica, 4 RT 630:4-631:22.

2

18.     Dr. Sirovica did not discuss, or offer any opinions on, "object code," "byte code," or "binary code" in his testimony.  *See* Sirovica, 4 RT 576:16-662:5.

**B. The Evidence Does Not Support an Award of Punitive Damages against Any Defendant.**

1.     The jury found Shi did not misappropriate any of plaintiff's claimed trade secrets. *See* ECF 487, pp. 2-4 (section I, questions 1-5, 8, 10).  The evidence is sufficient to support the jury's finding.

2.     The jury did not find Shi acted with "malice, oppression, or fraud."  *See* ECF 487, p. 6 (section III, question 1).  The evidence is sufficient to support the jury's finding.

3.     The jury did not find Hua acted with "malice, oppression, or fraud."  *See* ECF 487, pp. 6-7 (section III, questions 1-2).  The evidence is sufficient to support the jury's finding.

4.     There is no evidence that any managing agent of either RiverPay entity "willfully and maliciously" misappropriated plaintiff's source code.  Rather, the evidence shows Hua believed in good faith that Dino Lab owned the disputed code and could use it accordingly.  *See* 5 RT 867:11-868:1, 871:22-873:3, 886:22-887:6, 913:15-914:6; 6 RT 1057:1-4; Tr. Exh. 468.

5.     There is no evidence that any managing agent of either RiverPay entity knew and approved of any "willful and malicious" misappropriation of plaintiff's source code by any other RiverPay employee.  *See* Han, 5 RT 742:10-764:11; Zheng, 7 RT 1299:16-1309:24.

6.     RiverPay did not operate at a net profit in 2017.  Hua, 5 RT 919:11-920:3, 922:25-923:3; Tr. Exh. 76, p. DEF018550.  In 2017, RiverPay operated at a net loss of $74,017. Hua, 5 RT 919:11-920:3, 922:25-923:3; Tr. Exh. 76, p. DEF018550.

7.     In 2017, RiverPay's operating expenses were $201,211.  Tr. Exh. 76, p. DEF018550.

8.     RiverPay did not operate at a net profit in 2018.  Hua, 5 RT 919:11-920:3, 922:25-923:3; Tr. Exh. 76, p. DEF018550.  In 2018, RiverPay operated at a net loss of $2,916. Hua, 5 RT 919:11-920:3, 922:25-923:3; Tr. Exh. 76, p. DEF018550.

9.     In 2018, RiverPay's operating expenses went up to $953,744, an increase of approximately 4.75 times from the year before.  *See* Tr. Exh. 76, p. DEF018550.

3

1      10.     From January to September, 2019, RiverPay had $7,650,303.68 in total revenues

2  and $6,518,580.05 in COGS (Costs of Goods Sold), for a "gross margin" of $1,131,723.63. Tr.

3  Exh. 1176. This does not include actual operating expenses – only "costs of goods sold" or

4  "costs of sales." Tr. Exh. 1176; Hua, 5 RT 923:7-13; Mangum, 7 RT 1333:19-1334:4. "Costs of

5  goods sold"/"Costs of sales" are payments to a third party, that are related to the transactions and

6  associated revenue. *See* Mangum, 7 RT 1326:5-1327:19; *see also* Hua, 5 RT 920:9-921:1.

7      11.     RiverPay's *gross* profits through 2019 are $722,674, which still does not account

8  for all of RiverPay's costs – only costs related to the revenues. *See* Mangum, 7 RT 1332:13-

9  1334:22.

10      12.     To date, RiverPay is still operating at a loss. Hua, 6 RT 1054:12-14.

11      13.     RiverPay's preferred stock purchase agreement provides that investment funds are

12  to be used "to fund the Company's existing operations and for general corporate purposes or as

13  otherwise approved by the Board of Directors (which approval must include the approval of the

14  directors appointed by the Purchasers), and to pay the fees and expenses incurred by the

15  Company in connection with the transactions completed by this Agreement." Tr. Exh. 1134,

16  section 1.3. The preferred stock purchase agreement prohibits the use of "any proceeds from the

17  sale of the Preferred Stock to repay any outstanding debts of the Group Companies or to redeem

18  any outstanding Common Stock or other equity." Tr. Exh. 1134, section 1.3.

19      14.     Section 1(c) of RiverPay's SAFE Agreements provides as follows: "If there is a

20  Dissolution Event before this instrument expires or terminates, *the Company will pay an amount*

21  *equal to the Purchase Amount, due and payable to the Investor immediately prior to, or*

22  *concurrent with, the consummation of the Dissolution Event*. The Purchase Amount will be paid

23  prior and in preference to any Distribution of any of the assets of the Company to holders of

24  outstanding Capital Stock by reason of their ownership thereof. If immediately prior to the

25  consummation of the Dissolution Event, the assets of the Company legally available for

26  distribution to the Investor and all holders of all other Safes (the '**Dissolving Investors**'), as

27  determined in good faith by the Company's board of directors, are insufficient to permit the

28  payment to the Dissolving Investors of their respective Purchase Amounts, *then the entire assets*

4

DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW; BRIEFING ON PUNITIVE DAMAGES; Case No. 5:18-cv-02585-NC

*of the Company legally available for distribution will be distributed with equal priority and pro rata among the Dissolving Investors in proportion to the Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(c).*"  Tr. Exhs. 23, 24, and 32, p. 2 (italics added).  A "Dissolution Event" "means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (excluding a Liquidity Event), whether voluntary or involuntary."  Tr. Exhs. 23, 24, and 32, p. 3.

15.     A "Liquidity Event" "means a Change of Control or an Initial Public Offering."  Tr. Exhs. 23, 24, and 32, p. 3.  If there is a "Liquidity Event," the investor may opt to receive "a cash payment equal to the Purchase Amount," but if there are insufficient funds to pay all the Cash-Out investors in full, "all of the Company's available funds will be distributed with equal priority and pro rata among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price."  Tr. Exhs. 23, 24, and 32, p. 1.

16.     If RiverPay went bankrupt, it is not clear there would be enough money to pay all everything back to the preferred stock holders.  Mangum, 7 RT 1343:4-12.  The preferred stockholders would need to be fully paid before the common shareholders get anything.  Mangum, 7 RT 1343:4-12; *see also* Hua, 6 RT 996:20-997:12.

17.     At the end of 2018, RiverPay's total assets were $7,499,821 (which includes investment funds and $2,042,503 in "accounts receivable).  Tr. Exh. 76, p. DEF018548.  RiverPay's total liabilities and shareholders' equity were $7,499,821 (which includes the share capital and $1,605,743 in "accounts payable").  Tr. Exh. 76, p. DEF018548.  RiverPay had $3,766,453 in cash, which reflected the cash left over from the investment funds.  Tr. Exh. 76, p. DEF018551; Hua, 6 RT 995:15-996:4.

18.     As of the end of 2019, RiverPay's remaining investment funds had been spent on business expenses, including attorneys' fees incurred as a result of this action.  Hua, 6 RT 996:7-19.

**C. The Evidence Does Not Support Entry of an Injunction.**

1. Chunbo Huang testified that plaintiff lost an estimated $20 million because of defendants' misappropriation, which figure consisted of "the investment that we can potentially raise and also the client loss, the opportunity lost, cost we can't hide."  Huang, 2 RT 270:10-15.

2. Plaintiff failed to identify with specificity any POS device that allegedly had been retained by Hua.  Huang, 2 RT 265:1-268:5; Huang, 3 RT 318:1-319:1.

3. Plaintiff failed to identify the alleged trade secret in its "POS Designs" with reasonable specificity at trial.  *See* Jury Note 48 ("Does POS design refer to the hardware only or the data and/or software residing on POS device?"); *see also* 8 RT 1512:3-1516:8 (discussion on Jury Note 48 outside the presence of the jury); Huang, 3 RT 394:23-395:2; Huang, 5 RT 770:6-771:15, 774:24-775:7.

4. There is no source code on plaintiff's POS devices, only compiled code, i.e., object code.  Huang, 5 RT 770:17-771:6.

5. It is very difficult to reverse engineer the code on plaintiff's POS devices.  Huang, 5 RT 771:7-15.

6. No code was loaded onto the POS devices plaintiff sent to defendant Hua.  Hua, 6 RT 986:10-987:13.

7. Hua looked for and did not find in his control any POS device owned by plaintiff.  Hua, 5 RT 941:3-942:21; Hua, 6 RT 987:14-24.

8. Plaintiff introduced no evidence of how the POS devices interface with plaintiff's server, or any particular functionality of the object code on the device that differs from the pos_android source code files also claimed as a trade secret.  Huang, 3 RT 394:23-395:2; Huang, 5 RT 770:6-771:15, 774:24-775:7.

9. Plaintiff introduced no evidence that Hua decompiled any object code from any POS device owned by plaintiff, or that Hua did anything to obtain any information whatsoever from the POS device he allegedly retained after his employment with plaintiff ended.  Huang, 3 RT 394:23-395:2; Huang, 5 RT 770:6-771:15, 774:24-775:7.

///

6

1      10.     Plaintiff's expert, Dr. Sirovica, did not include in his analysis code provided by

2 Google that supports functionality of the android system for the android-based POS systems used

3 by the parties.  Sirovica, 4 RT 630:4-631:22.

4      11.     Dr. Sirovica did not discuss, or offer any opinions on, "object code," "byte code,"

5 or "binary code" in his testimony.  *See* Sirovica, 4 RT 576:16-662:5.

6    **II.**    <u>**Citcon's UCL Claim Based on Alleged Conversion of a POS Device.**</u>

7      1.     Plaintiff mailed one or two POS devices to defendant Hua.  Huang, 2 RT 265:1-

8 16, 267:13-268:1; Hua, 5 RT 941:3-942:21.

9      2.     When the POS devices were mailed to defendant Hua, plaintiff did not keep an

10 inventory of its POS devices.  Huang, 3 RT 317:16-318:9.

11      3.     Plaintiff failed to identify with specificity any POS device that allegedly had been

12 retained by Hua.  Huang, 2 RT 265:1-268:5; Huang, 3 RT 318:1-319:1.

13      4.     When Hua resigned from Citcon, Hua told plaintiff that he might possess a POS

14 device owned by plaintiff.  Hua, 5 RT 941:3-942:21, 6 RT 987:14-24.

15      5.     Hua looked for and did not find in his control any POS device owned by plaintiff.

16 Hua, 5 RT 941:3-942:21; Hua, 6 RT 987:14-24.

17      6.     RiverPay does not use the same POS device model as plaintiff.  Hua, 6 RT

18 985:18-986:9.

19      7.     RiverPay has not acquired or used any POS device owned by Plaintiff.  Hua, 6 RT

20 986:10-987:3; *see also* ECF 487, pp. 3, 5 (section I, question 6; section II, question 2).

21      8.     Plaintiff's POS devices were valued at between $80 and $400.  Tr. Exh. 1070;

22 Huang, 3 RT 319:2-5; Hua, 5 RT 891:4-21, 893:7-894:23; 941:3-18.

23      9.     The jury awarded plaintiff $301.76 on its claim for conversion of a POS device.

24 *See* ECF 487, p. 6 (section II, question 7).

25    **III.**    <u>**RiverPay's UCL Claim.**</u>

26      1.     Plaintiff has been spreading rumors that RiverPay is going out of business.  Hua,

27 5 RT 924:5-10.  As a result, RiverPay is not on track to realize revenues of $30-$90 million in

28 2019, or even close to it.  Hua, 5 RT 924:5-10.

2.       As of the end of 2019, RiverPay's remaining investment funds had been spent on business expenses, including attorneys' fees incurred as a result of this action.  Hua, 6 RT 996:7-19.

3.       In relevant part, the parties' protective order in this matter states: "[a] receiving party may *use* Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case *only for prosecuting, defending, or attempting to settle this litigation*."  ECF 43, p. 8:17-19 (emphasis added).  Defendants and counter-claimants previously moved for sanctions, arguing that plaintiff and its counsel used information they learned from reviewing defendants' source code to file a new lawsuit, *Citcon USA LLC v. MaplePay Inc., et al.*, Case No. 5:19-CV-02112.  *See* ECF 220-3, 220-4, 265, pp. 5:11-28, 7:1-7.  Defendants and counter-claimants sought the disqualification of plaintiff's counsel from representing anyone against a potential defendant discovered through the use of confidential information in this case, dismissal of the new lawsuit, and monetary sanctions.  *See* ECF 220-3, 220-4, 265, p. 10:5-18. The Court took the matter under submission at the hearing and has not yet issued a decision.  The Court takes judicial notice of (1) the fact that the *MaplePay* case was filed; and (2) the fact that defendants' and counter-claimants' sanctions motion was filed, the above arguments were advanced, and the motion remains pending.  *See* Fed. R. Evid. 201(b).

4.       On or about December 30, 2019, RiverPay's reseller partner received an email from "Citcon Legal."  *See* Supplemental Declaration of Ryan Zheng in Support of Defendants' Motion for Sanctions (ECF 265) and Request to Reopen Evidence ("Supp. Zheng Decl."), Exh. A.[1]  The email included a link to a letter from plaintiff's counsel in this action, dated December 27, 2019 and addressed to "RiverPay's Payment Service Partners."  *See id.*, Exh. B.  The identities and contact information for most of RiverPay's merchant customers and other business partners are not publicly known.  *Id.*, ¶ 3.  Both the email and the letter represented that the jury in this case "awarded punitive damages, the amount of which will be determined by the judge in the post-trial proceedings."  *See id.*, Exhs. A & B.  The email and letter threatened that

---

[1] Defendants and counter-claimants intend to file a regularly noticed motion to reopen evidence no later than January 17, 2020.

1   "continued use of RiverPay's payment system after the verdict will subject you to trade secret

2   misappropriation liability," and demanded that the recipient "immediately cease your use of

3   RiverPay's payment system."  *See id.*, Exhs. A & B.  Such threats are extremely damaging to

4   RiverPay's relationships with its business partners.  *Id.*, ¶ 2.  Since the email and letter were sent,

5   RiverPay has been receiving daily calls and emails from its merchant customers and business

6   partners, expressing concern over their receipt of similar correspondence from plaintiff and its

7   counsel.  *See id.*, ¶ 5.  To date, RiverPay has received calls and emails from over 15 of its

8   merchant customers, including many who are not publicly known, Alipay, WeChat Pay, and at

9   least one of its investors, all of whom have received similar correspondence from Citcon and its

10  counsel.  *See id.*, ¶ 5.

11       5.      Counter-defendant Wei Jiang proposed to RiverPay's CEO, Ryan Zheng, that

12  Citcon and RiverPay should "divide the territory," meaning, "RiverPay took Neiman Marcus and

13  Citcon take Macy's and we don't compete in price.  We're separate merchants."  Zheng, 7 RT

14  1308:3-24.

15       6.      The Court granted defendants' motion for judgment as a matter of law under Rule

16  50(a) as to plaintiff's claim for trade secret misappropriation of its customer list.  *See* 6 RT

17  1186:18-1188:8.  The Court stated that as to the customer list, "I don't find any evidence that the

18  jury reasonably could reach a conclusion on that there is a trade secret customer list."  6 RT

19  1187:22-24.  The Court further stated: "There has been an absence of evidence that a reasonable

20  jury could use to determine that a customer list itself is something that is a trade secret, a trade

21  secret that has independent value and it was misappropriated by the defendants."  6 RT 1188:2-6.

22       7.      The Court granted defendants' motion for judgment as a matter of law under Rule

23  50(a) as to plaintiff's claim for conversion based on the alleged refund attack.  *See* 6 RT

24  1186:18-1187:17.  The Court found there was no fund or account identified for the conversion of

25  funds claim.  *See* 6 RT 1187:12-17; *see also* 5 RT 850:6-17.

26  ///

27  ///

28  ///

9

**PROPOSED CONCLUSIONS OF LAW**

**I.**     <u>**Trade Secrets Remedies.**</u>

   **A. Plaintiff Is Not Entitled to Any Reasonable Royalty.**

   1.     California Civil Code section 3426.3(b) provides: "If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited."

   2.     "A reasonable royalty award attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff.  By means of a 'suppositious meeting' between the parties, the court calculates what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred."  *Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir. 1996) (applying the California Uniform Trade Secrets Act and concluding it was error for the district court to equate the amount plaintiff would have charged with a "reasonable royalty").

   3.     The following factors are relevant to the Court's analysis of a reasonable royalty:

   1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

   2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

   3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

   4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

   5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

   6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

   7. The duration of the patent and the term of the license.

   8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

10

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee— who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971), *cited with approval by O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1078 (N.D. Cal. 2005), *amended on other grounds*, 420 F. Supp. 2d 1070 (N.D. Cal. 2006).

    4.      Although the court in *O2 Micro* found these factors were relevant to the analysis of reasonable royalties in a trade secret action (*see O2 Micro Int'l Ltd.*, 399 F. Supp. 2d at 1078), here plaintiff has failed to introduce evidence sufficient to enable the Court to apply most of them.  Defendants introduced evidence that plaintiff had no royalty agreements when Hua was working there.  Hua, 8 RT 1520:1-3.  Plaintiff introduced no evidence of any royalties actually received by it or paid by defendants (Huang, 8 RT 1516:24-1519:17); therefore factors one and two do not favor an award of a reasonable royalty.  There was no description of the nature, scope, or term of the proposed hypothetical license.  Huang, 8 RT 1516:24-1519:17.  Although plaintiff and defendants are competitors and Huang said they would generally not do a license,

11

1   there are many other competitors that provide the same service.  Yin, 3 RT 457:15-461:4; Hua, 5

2   RT 810:21-812:17; Tr. Exhs. 54, 1187.  Neither company has been operating at a net profit.

3   Huang, 8 RT 1518:8-11; Hua, 5 RT 922:25-923:3; Hua, 6 RT 1054:12-14; Tr. Exh. 76, p.

4   DEF018550.  Plaintiff did not offer evidence of how the utility or benefits of its product compare

5   to that of other competitors.  *Cf.* Huang, 3 RT 382:16-383:1 ("I cannot access my competitor's

6   source code.").

7        5.      With respect to the "POS designs" in particular, plaintiff introduced no evidence

8   that any code was on a device sent to Hua and not returned; no evidence that Hua decompiled

9   any object code from any POS device owned by plaintiff, no evidence that Hua did anything to

10  obtain any information whatsoever from the POS device he allegedly retained after his

11  employment with plaintiff ended, and no expert opinion testimony.  Huang, 3 RT 394:23-395:2;

12  Huang, 5 RT 770:6-771:15, 774:24-775:7; Sirovica, 4 RT 576:16-662:5; Hua, 6 RT 986:10-

13  987:13.  Plaintiff introduced no evidence of the amount of its revenue (if any) or defendants'

14  revenue that is attributable to "POS Designs."  Huang, 8 RT 1516:24-1519:17.

15       6.      Finally, the evidence of the rate plaintiff would demand occurred in the context of

16  litigation, after plaintiff had already gotten a look at defendants' financial information (*see*

17  Huang, 8 RT 1517:16-18), and plaintiff did not say one way or the other whether the demand

18  would have been the same had it been made at the time of the alleged misappropriation, when

19  supposedly RiverPay was not considered a major competitor (*see* Yang, 3 RT 417:19-418:5).  *Cf.*

20  *Vermont Microsystems, Inc.*, 88 F.3d at 151-52 (royalty did not reflect an approximate

21  agreement, bargained in good faith at the time of the misappropriation, but rather, "the opening

22  gambit in anticipated settlement negotiations").  The balance of the factors weighs against any

23  award of a reasonable royalty.

24       7.      Plaintiff is not entitled to a reasonable royalty on any of its trade secret claims,

25  because it failed to establish misappropriation of its alleged trade secrets in transaction data or

26  business plans; it failed to break down its demanded royalty amount between the respective

27  "non-source code trade secrets," and specifically, it failed to introduce evidence of any

28  reasonable royalty rate it might demand for its claimed trade secret in "POS designs" alone; it

12

1   failed to introduce evidence showing the balance of the factors above warrant a reasonable

2   royalty for the "POS designs" or any other "non-source code trade secret"; it failed to introduce

3   any evidence of what a reasonable royalty would be for its source code trade secret claim; and

4   the jury awarded unjust enrichment damages on plaintiff's claim for misappropriation of source

5   code. *See* ECF 487, pp. 3-4 (section I, questions 6-8, 10); 8 RT 1516:24-1521:6.

6         **B.  Plaintiff Is Not Entitled to Punitive Damages.**

7         1.     Punitive damages for trade secret misappropriation may be awarded only where a

8   defendant is guilty of engaging in willful and malicious misappropriation.  Cal. Civ. Code §

9   3426.3(c); *Mattel, Inc. v. MGA Entertainment, Inc.*, 801 F. Supp. 2d 950, 952-53 (C.D. Cal.

10  2011) (calculation of the amount of the punitive damages is a matter for the court's discretion

11  upon plaintiff's proof of "willful and malicious" misconduct).  Likewise, the DTSA provides that

12  a court may, "if the trade secret is willfully and maliciously misappropriated, award exemplary

13  damages in the amount not more than 2 times the amount of the damages awarded under

14  subparagraph (B)."  18 U.S.C. section 1836(b)(3).

15        2.     The jury here was not asked about and did not find "willful and malicious"

16  misappropriation by RiverPay.  The jury was asked whether Citcon proved by clear and

17  convincing evidence that RiverPay, Hua, or Shi acted with "malice, oppression, *or* fraud" in

18  committing trade secret misappropriation of source code.  ECF 487, at III.1, 6:13-18 (emphasis

19  added).  The jury circled the "a" next to RiverPay.  Therefore, the question that the jury was

20  asked and that the jury answered does not include any finding of willfulness, much less any

21  finding of willfulness *and* malice, as required for exemplary damages under Civil Code §

22  3426.3(c) and 18 U.S.C. § 1836(b)(3)(C).  It is unclear from the jury's answer to Question III.1

23  (Punitive Damages) whether the jury found that RiverPay acted with malice, or acted with

24  oppression, or acted with fraud in committing misappropriation.  Because the question is phrased

25  in the disjunctive, the jury may have relied on only one of the three ("malice, oppression, *or*

26  fraud").  As such, the jury did not necessarily find that RiverPay acted with malice, and the jury

27  was not asked about and did not receive any instruction on "willful," as required for a finding

28  under Civil Code § 3426.3(c) and 18 U.S.C. § 1836(b)(3)(C).

3.   California law defines "malice" for purposes of civil punitive damages as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  Cal. Civ. Code § 3294(c)(1).  The jury did not find that Hua acted with malice, oppression, or fraud.  In addition, the jury not only declined to find that Shi acted with malice, oppression, or fraud, the jury did not find Shi misappropriated any information claimed as a trade secret.  *See* ECF 487, pp. 2-4, 6-7.  The jury's findings were supported by the evidence.

4.   The Ninth Circuit has recognized that for purposes of punitive damages, corporations can only act through their agents and employees.  *See Protectus Alpha Nav. Co., Ltd. v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379, 1386 (9th Cir. 1985).  Neither RiverPay entity is capable of holding any mental state independent of its agents and employees.  *See Cruz v. HomeBase*, 83 Cal. App. 4th 160, 167 (2000) ("Corporations are legal entities which do not have minds capable of recklessness, wickedness, or intent to injure or deceive."); *see also Taiwan Semiconductor Mfg. Co., Ltd. v. Tela Innovations, Inc.*, No. 14-cv-00362-BLF, 2014 WL 3705350, at *6 (N.D. Cal. July 24, 2014) ("Under California punitive damages law, a company simply cannot commit willful and malicious conduct—only an individual can.").  Furthermore, under California law, "[c]orporations may be held liable for punitive damages through the malicious acts or omissions of their employees, but only for the acts or omissions of those employees with sufficient discretion to determine corporate policy."  *Davis v. Kiewit Pac. Co.*, 220 Cal. App. 4th 358, 365 (2013) (interpreting Cal. Civ. Code § 3294(b)).  This limitation exists because, in California, "the law does not impute every employee's malice to the corporation."  *Cruz*, 83 Cal. App. 4th at 167.

5.   "Whether the corporation will be liable for punitive damages depends, not on the nature of the consequences, but rather on whether *the malicious employee* belongs to the leadership group of 'officers, directors, and managing agents.'"  *Cruz*, 83 Cal. App. 4th at 168 (emphasis added); *see also Larkin v. Home Depot, Inc.*, No. 13-cv-2868-LB, 2015 WL 1049716, at *3 (N.D. Cal. Mar. 9, 2015) ("Section 3294 allows punitive damages to be awarded only where there is 'clear and convincing evidence' that a corporate employer's 'managing agent' has

14

1    been guilty of 'oppression, fraud, or malice.'").

2         6.      Here, regardless of whether or not Hua qualifies as a managing agent, Hua cannot

3    be "the malicious employee" because there is no evidence that he acted with "malice" as defined

4    in section 3294, and the jury did not so find.  *See* ECF 487, pp. 6-7.  Not only does the record

5    lack evidence that Hua used Dino Lab's code specifically to harm plaintiff or that doing so was

6    "despicable" conduct in "willful and conscious disregard" of plaintiff's rights, the evidence

7    shows Hua believed in good faith that Dino Lab owned the disputed code and could use it

8    accordingly.  *See* 5 RT 867:11-868:1, 871:22-873:3, 886:22-887:6, 913:15-914:6; 6 RT 1057:1-

9    4; Tr. Exh. 468.  In addition, the jury did not find that Shi acted with "malice, oppression, or

10   fraud," and did not find Shi misappropriated any information claimed as a trade secret.  *See* ECF

11   487, pp. 2-4, 6-7.  The jury's findings were consistent with the evidence.  Therefore, Shi also

12   cannot be "the malicious employee."  Ryan Zheng and Simon Han also testified at trial, but their

13   testimony did not concern source code.  5 RT 742:10-764:11; 7 RT 1299:16-1309:24.  Assuming

14   these witnesses qualify as corporate policymakers, plaintiff presented no evidence that they knew

15   or approved of any act deemed to be malicious, or any act whatsoever having to do with the

16   source code at issue.

17        7.      In determining the amount of punitive damages, the court must consider (1) the

18   nature of the misconduct; (2) the amount of compensatory damages; and (3) the defendant's

19   financial condition.  *See O2 Micro Int'l Ltd.*, 399 F. Supp. 2d at 1079.  Under CUTSA, however,

20   a court may not make an award of punitive damages that is greater than twice the award of

21   compensatory damages.  *See Mattel, Inc.*, 801 F. Supp. 2d at 952-53.

22        8.      California courts generally are prohibited from imposing punitive damages

23   awards that exceed 10% of the net worth of the defendant.  *Michelson v. Hamada*, 29 Cal. App.

24   4th 1566, 1596 (1994) ("[Punitive] awards generally are not allowed to exceed 10 percent of the

25   net worth of the defendant."); *see also Sterling Cross Def. Sys., Inc. v. Dolarian Capital, Inc.*,

26   No. 1:13-cv-01773 AWI EPG, 2015 WL 12697065, at *2 (E.D. Cal. Dec. 24, 2015) (observing

27   that "[a]s a general rule, punitive damages awards of approximately 10 percent of the

28   defendant's net worth (or less) have been upheld by California courts, while greater amounts

1    have been set aside as excessive.").

2        9.    The plaintiff has the burden of introducing evidence of the defendant's financial

3    condition at trial.  *Adams v. Murakami*, 54 Cal. 3d 105, 119 (1991).  If the plaintiff fails to

4    present such evidence, the punitive damages award cannot stand.  *See id.* at 119-23.

5        10.    The requirement that plaintiff present evidence of the defendant's financial

6    condition applies in trade secret misappropriation cases.  *See Vacco Indus., Inc. v. Van Den Berg*,

7    5 Cal. App. 4th 34, 46 n.11 (1992) (under *Adams*, "substantial evidence of [a defendant's]

8    financial condition" is required to award punitive damages under CUTSA).

9        11.    To establish a defendant's net worth, "the 'net' concept of the net worth metric

10   remains critical."  *Soto*, 239 Cal. App. 4th at 194; *Boyle v. Lorimar Prods.*, 13 F.3d 1357, 1361

11   (9th Cir. 1994) ("only net, not gross, figures are relevant.").  "Normally, evidence of liabilities

12   should accompany evidence of assets, and evidence of expenses should accompany evidence of

13   income."  *Baxter v. Peterson*, 150 Cal. App. 4th 673, 680 (2007).

14       12.    RiverPay is unable to pay punitive damages.  The evidence shows that RiverPay

15   did not operate at a net profit in 2017.  Hua, 5 RT 919:11-920:3, 922:25-923:3; Tr. Exh. 76, p.

16   DEF018550.  In 2017, RiverPay operated at a net loss of $74,017.  Hua, 5 RT 919:11-920:3,

17   922:25-923:3; Tr. Exh. 76, p. DEF018550.  RiverPay did not operate at a net profit in 2018.

18   Hua, 5 RT 919:11-920:3, 922:25-923:3; Tr. Exh. 76, p. DEF018550.  In 2018, RiverPay operated

19   at a net loss of $2,916.  Hua, 5 RT 919:11-920:3, 922:25-923:3; Tr. Exh. 76, p. DEF018550.

20   RiverPay's gross profits through 2019 are $722,674, which still does not account for all of

21   RiverPay's costs – only costs related to the revenues.  *See* Mangum, 7 RT 1332:13-1334:22.  To

22   date, RiverPay is still operating at a loss.  Hua, 6 RT 1054:12-14.  If RiverPay went bankrupt, it

23   is not clear there would be enough money to pay everything back to the preferred stock holders.

24   Mangum, 7 RT 1343:4-12.  The preferred stockholders would need to be fully paid before the

25   common shareholders get anything.  Mangum, 7 RT 1343:4-12; *see also* Hua, 6 RT 996:20-

26   997:12.  At the end of 2018, RiverPay's total assets were $7,499,821 (which includes investment

27   funds and $2,042,503 in "accounts receivable).  Tr. Exh. 76, p. DEF018548.  RiverPay's total

28   liabilities and shareholders' equity were $7,499,821 (which includes the share capital and

16

$1,605,743 in "accounts payable"). Tr. Exh. 76, p. DEF018548. RiverPay had $3,766,453 in cash, which reflected the cash left over from the investment funds. Tr. Exh. 76, p. DEF018551; Hua, 6 RT 995:15-996:4. As of the end of 2019, RiverPay's remaining investment funds had been spent on business expenses, including attorneys' fees incurred as a result of this action. Hua, 6 RT 996:7-19. Thus, the evidence reflects that RiverPay's net worth is zero, due to its lack of profit since its inception, its ongoing debt to its investors, and the reasonable expenditure of all of its resources on business expenses including this lawsuit.

13.     The Due Process Clause of the Fourteenth Amendment substantively limits an award of punitive damages. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) ("*BMW*"). "Whether an award of punitive damages exceeds the bounds of due process is determined on a case-by-case basis by examining: (1) the reprehensibility of the conduct being punished; (2) the ratio of the punitive damages award to the compensatory damages award; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases." *Flores v. City of Westminster*, 873 F.3d 739, 759 (9th Cir. 2017) (citing *BMW*, 517 U.S. at 568, 575, 580-83). An excessive award "cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal." *BMW*, 517 U.S. at 584. Single-digit ratios between punitive and compensatory damages are more likely to satisfy due process. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("*State Farm*").

14.     "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at 575. A jury finding of willful and malicious trade secret misappropriation, without more, is not a sufficient finding of reprehensibility to guarantee exemplary damages. *See EnerTrode, Inc. v. General Capacitor Co. Ltd.*, No. 16-cv-02458-HSG, 2019 WL 1715170, at *8-9 (N.D. Cal. April 17, 2019) (denying plaintiffs' motion for exemplary damages where the jury found willful and malicious misappropriation; defendant did not harm third parties, commit acts of misconduct over a long period of time, or misappropriate more than one trade secret).

15.     The Court should accord "substantial deference" to legislative judgments

1  regarding civil penalties for analogous conduct.  *See BMW*, 517 U.S. at 583.  In *BMW*, the court

2  found that various state statutes imposing civil penalties ranging from $2,000 to $10,000 for

3  deceptive trade practices did not provide fair notice to defendant that it might be subject to a

4  multimillion dollar penalty for similar conduct.  *See BMW*, 517 U.S. at 583-84.  California's

5  unfair competition law provides a civil penalty up to $2,500 for a "fraudulent business act."  *See*

6  Cal. Bus. & Prof. Code § 17206(a).

7       16.     Under the standards articulated above, the Court declines, in its discretion, to

8  award punitive damages.  The jury found misappropriation of one trade secret by RiverPay and

9  awarded substantial unjust enrichment damages of $1.5 million.  In light of the evidence showing

10  that RiverPay reasonably believed it was entitled to use the code at issue, the evidence of

11  RiverPay's financial condition, and the size of the customary statutory penalties for similar

12  violations, no additional punitive damages are reasonable or necessary to deter any future

13  misconduct.

14  **C.  Plaintiff Is Not Entitled to an Injunction.**

15       1.     An injunction is an extraordinary remedy never awarded as of right, and "does not

16  follow from success on the merits as a matter of course."  *Winter v. Natural Resources Defense*

17  *Council, Inc.*, 555 U.S. 7, 24, 32 (2008) (courts should "pay particular regard for the public

18  consequences in employing the extraordinary remedy of injunction" in exercising their sound

19  discretion); *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1449 (2002) ("Injunctions in the

20  area of trade secrets are governed by the principles applicable to injunctions in general.").

21       2.     "Like any judgment, a permanent injunction, notwithstanding its discretionary

22  component, must be sufficiently supported by the evidence of record."  *DVD Copy Control*

23  *Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 721 (2009) (internal quotations and

24  citation omitted).  "If the evidence is insufficient to justify issuance of a permanent injunction,

25  the trial court simply ha[s] no discretion to exercise."  *Id.* (internal quotations and citation

26  omitted); *see also BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, No. 5:15-cv-01370-EJD, 2019

27  WL 1117537, at *2 (N.D. Cal. Mar. 11, 2019) (quoting *DVD Copy Control Ass'n, Inc.*, 176 Cal.

28  App. 4th at 721); *see id.* at *3 (holding plaintiff failed to show monetary damages were

18

DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW; BRIEFING ON PUNITIVE DAMAGES; Case No. 5:18-cv-02585-NC

1    inadequate, where plaintiff's damages expert calculated lost profits over time).[2]

2         3.    To obtain an injunction, a plaintiff must show (1) that it has suffered an

3    irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate

4    to compensate for that injury; (3) that, considering the balance of hardships between plaintiff and

5    defendant, an equitable remedy is warranted; and (4) that an injunction is in the public interest.

6    *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  "[T]he basis of injunctive

7    relief in the federal courts has always been irreparable harm and inadequacy of legal remedies[.]"

8    *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (internal quotations and citations omitted).  "[T]o

9    say that the harm is irreparable is simply another way of saying that pecuniary compensation

10   would not afford adequate relief or that it would be extremely difficult to ascertain the amount

11   that would afford adequate relief."  *Grail Semiconductor, Inc. v. Mitsubishi Elec. & Elecs. USA,*

12   *Inc.*, 225 Cal. App. 4th 786, 801 (2014) (internal quotations omitted).

13        4.    "[U]nlike a patent, a trade secret affords no rights against the independent

14   development of the same technology or knowledge by others."  *CVD, Inc. v. Raytheon Co.*, 769

15   F.2d 842, 850 (1st Cir. 1985).

16        5.    Here, as in *Bladeroom*, plaintiff's own witness testified that Citcon's monetary

17   loss could be quantified.  Chunbo Huang testified that that plaintiff lost an estimated $20 million

18   because of defendants' misappropriation, which figure consisted of "the investment that we can

19   potentially raise and also the client loss, the opportunity lost, cost we can't hide."  Huang, 2 RT

20   270:10-15.  The fact that the jury simply did not award more or different monetary damages does

21   not warrant injunctive relief.

22        6.    In *Allied Erecting and Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, the

23   Northern District of Ohio confronted a situation in which plaintiff, in addition to its jury award

24   of over 3 million dollars in unjust enrichment, claimed to also be entitled to a permanent

25   injunction.  *See Allied Erecting and Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, No.

26

27   ─────────────────────
     [2] Order appealed to the U.S. Court of Appeals for the Ninth Circuit on September 3, 2019, Case
28   No. 19-16730.

1   4:06CV114, 2010 WL 3370286, at *1-2 (N.D. Ohio Aug. 26, 2010).  The district court

2   disagreed.  *Id.* at *3.  The court reiterated the principle that "[i]rreparable harm is harm which is

3   not compensable by money damages," that "mere injuries in terms of money, time and energy

4   are not sufficient, and that the possibility of adequate compensation weighs heavily against a

5   claim of irreparable harm."  *Allied Erecting and Dismantling Co., Inc.*, 2010 WL 3370286, at *1

6   (citing *Sampson*, 415 U.S. at 90).  The Court determined that plaintiff had failed to bear its

7   burden of showing that the harm it claimed to be irreparable was not adequately compensated by

8   the jury's unjust enrichment award.  *Allied Erecting and Dismantling Co., Inc.*, 2010 WL

9   3370286, at *3.  Here, too, the jury's monetary award adequately compensated plaintiff.  No

10  injunctive relief is appropriate.

11          7.      A plaintiff that fails to identify trade secrets with reasonable particularity is not

12  entitled to injunctive relief.  *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522–23

13  (9th Cir. 1993) ("Since the trade secrets are not specifically identified, we cannot determine

14  whether Peak has misappropriated any trade secrets by running the MAI operating software

15  and/or diagnostic software in maintaining MAI systems for its customers, and we reverse the

16  district court's grant of summary judgment in favor of MAI on its claim that Peak

17  misappropriated trade secrets in its computer software and vacate the permanent injunction as it

18  relates to this issue."), *overruled on other grounds as noted in Lucent Techs., Inc. v. Bd. of*

19  *Equalization*, 241 Cal. App. 4th 19, 37 (2015).  Here, plaintiff failed to identify the alleged trade

20  secret in its "POS Designs" with reasonable specificity at trial.  *See* Jury Note 48 ("Does POS

21  design refer to the hardware <u>only</u> or the data and/or software residing on POS device?"); *see also*

22  8 RT 1512:3-1516:8 (discussion on Jury Note 48 outside the presence of the jury); Huang, 3 RT

23  394:23-395:2; Huang, 5 RT 770:6-771:15, 774:24-775:7.  Plaintiff likewise failed to establish

24  that Hua – who cannot even find any such device in his possession – did anything to obtain any

25  object code or other information from it.  Huang, 3 RT 394:23-395:2; Huang, 5 RT 770:6-

26  771:15, 774:24-775:7; Hua, 5 RT 941:3-942:21; Hua, 6 RT 987:14-24.  For this reason also,

27  injunctive relief is not warranted.

28  ///

## II. Plaintiff Is Not Entitled to Any Remedies on Its UCL Claim Based on Conversion of a POS Device.

1.     Section 17200 of the California Business and Professions Code ("UCL") provides: "[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act[.]"  Cal. Bus. & Prof. Code § 17200.

2.     The UCL "embraces anything that can properly be called a business practice and that at the same time is forbidden by law ….  Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003) (quoting *Cel-Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)) (internal quotation marks omitted).

3.     But, while the scope of the UCL is broad, the available remedies are limited.  *See Cel-Tech*, 20 Cal. 4th at 180.  "Under the UCL, a private plaintiff's remedies are limited to injunctive relief and restitution."  *Duste v. Chevron Prods. Co.*, 738 F. Supp. 2d 1027, 1047 (N.D. Cal. 2010).  "While any member of the public can bring suit under the act to enjoin a business from engaging in unfair competition, it is well established that individuals may not recover damages."  *Korea Supply Co.*, 29 Cal. 4th at 1150.  Unfair competition law "does not mandate restitutionary or injunctive relief when an unfair business practice has been shown. Rather it provides that the court '*may* make such orders or judgments[.]'"  *Cortez v. Purolator Air Filtration Prods Co.*, 23 Cal. 4th 163, 180 (2000) (emphasis in original).

4.     Citcon cannot recover under the UCL on the theory that information claimed to be a trade secret, or "intangible, non-trade secret" information, resided on a POS device retained by Hua, because such claims would be preempted by the California Uniform Trade Secrets Act.  *See UCAR Tech. (USA) Inc. v. Yan Li*, No. 5:17-cv-01704-EJD, 2018 WL 2555429, at *3-4 (N.D. Cal. June 4, 2018).

5.     For a request for injunctive relief to be granted under the UCL, "there must be a threat that the wrongful conduct will continue.  Injunctive relief will be denied if, at the time of the order of judgment, there is no reasonable probability that the past acts complained of will recur[.]"  *Davis v. Farmers Ins. Exch.*, 245 Cal. App. 4th 1302, 1326-27 (2016) (internal

1  quotations and citation omitted).  Here, there has been no evidence that Hua is likely to come

2  into possession of another POS device belonging to plaintiff, and Hua testified under oath that he

3  looked for, but could not find, any POS device belonging to plaintiff.  An injunction requiring

4  Hua to return what he already testified he could not find would be pointless, and in any event,

5  Citcon has been fully compensated for its loss by the jury's monetary award.  *See eBay Inc.*, 547

6  U.S. at 391 (remedy at law must be inadequate).

7       6.     "The object of restitution is to restore the status quo," and "nonrestitutionary

8  disgorgement of profits is not an available remedy in an individual action under the UCL."

9  *Korea Supply Co.*, 29 Cal. 4th at 1149, 1152.  Because plaintiff presented no evidence that Hua

10  took any money or property other than the device itself, for which Citcon has already been

11  compensated, Citcon is not entitled to restitution on its UCL claim.

12       **III.**     **RiverPay's UCL Claim.**

13       1.     To have standing under the UCL, a plaintiff must allege injury in fact and loss of

14  money or property as a result of the defendant's unfair business practices.  *See* Cal. Bus. & Prof.

15  Code § 17204.  A UCL plaintiff can demonstrate economic injury if the plaintiff had to do any of

16  the following: "(1) surrender in a transaction more, or acquire in a transaction less, than he or she

17  otherwise would have; (2) have a present or future property interest diminished; (3) be deprived

18  of money or property to which he or she has a cognizable claim; or (4) be required to enter into a

19  transaction, costing money or property, that would otherwise have been unnecessary."  *Kwikset*

20  *Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011).  It is not necessary to show eligibility for

21  restitution to establish standing.  *See id.* at 336-37.

22       2.     Because the UCL is written in the disjunctive, it establishes three independent

23  types of unfair competition: unlawful business practices, unfair business practices, and

24  fraudulent business practices.  *See Cel-Tech*, 20 Cal. 4th at 180.

25       3.     In "direct competitor" cases, the California Supreme Court has held the following

26  test determines whether the "unfair" prong applies:

27            When a plaintiff who claims to have suffered injury from a direct competitor's

28            'unfair' act or practice invokes 17200, the word 'unfair' in that section means
          conduct that *threatens an incipient violation of an antitrust law*, or *violates the*

22

1   *policy or spirit of one of those laws* because its effects are *comparable to or the*
2   *same* as a violation of the law, or *otherwise significantly threatens or harms*
    *competition.*

3   *Cel-Tech*, 20 Cal. 4th at 187 (emphasis added).  Jiang's proposal to Zheng that Citcon and

4   RiverPay should "divide the territory," and not "compete in price" threatens an incipient

5   violation of an antitrust law, or otherwise significantly threatens or harms competition.  It may be

6   inferred that plaintiff's subsequent lawsuit might have been less likely had Zheng actually agreed

7   to this proposal.

8         4.      "[T]he assertion of a trade secret claim in bad faith, in an attempt to monopolize,

9   can be a violation of the antitrust laws."  *CVD, Inc.*, 769 F.2d at 851, *cited with approval in Sosa*

10  *v. DIRECTV, Inc.*, 437 F.3d 923, 937 (9th Cir. 2006).  "[T]he assertion in bad faith of trade

11  secret claims, that is, with the knowledge that no trade secrets exist, for the purpose of

12  restraining competition does not further the policies of either the antitrust or the trade secrets

13  laws."  *CVD, Inc.*, 769 F.2d at 851.

14        5.      Plaintiff's claim for misappropriation of its customer list was objectively baseless.

15  Plaintiff failed to produce such list or any evidence that it had independent economic value or

16  was misappropriated.  It may be inferred from the other circumstantial evidence that it was

17  brought for improper anticompetitive purposes.

18        6.      Plaintiff's claim for conversion of funds based on the alleged "refund attack" also

19  was objectively baseless.  Plaintiff failed to identify a fund or account that supported this claim.

20  It may be inferred from the other circumstantial evidence that it was brought for improper

21  anticompetitive purposes, and for the purpose of harming defendants' reputation.

22        7.      Judge-made law can serve as the predicate violation for a claim under the

23  "unlawful" prong of the UCL.  *See Hewlett v. Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499,

24  533-35 (1997) (violations of a TRO may be prosecuted as an unlawful business practice),

25  *superseded by statute on other grounds as noted in United Farm Workers of America v. Dutra*

26  *Farms*, 83 Cal. App. 4th 1146, 1163-64 (2000); *see also Bondanza v. Peninsula Hosp. & Med.*

27  *Ctr.*, 23 Cal. 3d 260, 263, 265-67 (1979) (hospital's practice of collecting fees was

28  "impermissible under the principles set forth in" case law interpreting Civil Code section 1671).

1    Counter-defendants violated the Court's protective order in this case by filing the *MaplePay*

2    case, using information they obtained in discovery, pursuant to the protective order in this case.

3    In addition, it may be inferred from the circumstantial evidence that counter-defendants more

4    likely than not obtained in discovery the contact information they needed to send the December

5    30, 2019 email and December 27, 2019 letter.  This violates the protective order in this case for

6    the same reason as the *MaplePay* filing.

7        8.    The December 27, 2019 letter does not accurately state the jury's findings,

8    because it is not accurate to say the jury "awarded punitive damages."  Rather, the jury answered

9    a question on a verdict form regarding defendants' mental state.  A jury finding of willful and

10   malicious trade secret misappropriation, without more, is not a sufficient finding of

11   reprehensibility to guarantee exemplary damages.  *See EnerTrode, Inc. v. General Capacitor Co.*

12   *Ltd.*, No. 16-cv-02458-HSG, 2019 WL 1715170, at *8-9 (N.D. Cal. April 17, 2019).  The email

13   and letter demonstrate counter-defendants' anticompetitive intent by threatening the recipients

14   that they may be civilly liable if they continue to use RiverPay's products.

15       9.    Counter-defendants and their agents have engaged in a pattern and practice of

16   unfair competition against counter-claimants, which includes filing baseless litigation to gain a

17   competitive advantage, proposing violation of the antitrust laws as an alternative to the implied

18   threat of having to defend such litigation,  and communicating with counter-claimants' business

19   partners in a manner that violates this Court's protective order, threatens others if they do

20   business with counter-claimants, or misrepresents the outcome of this litigation.  Monetary relief

21   is not adequate to prevent this pattern and practice of anti-competitive conduct from continuing.

22       10.   Counter-claimants have standing because they lost money as a result of plaintiff's

23   anti-competitive practices, in the form of lost revenues, attorneys' fees spent on this litigation,

24   and in addition, time and money spent trying to reassure their business partners.  Hua, 5 RT

25   923:17-924:10; Hua, 6 RT 996:7-19; Supp. Zheng Decl., ¶¶ 2, 5 & Exhs. B & D.

26       11.   Based upon the foregoing findings, counter-claimants are entitled to an injunction

27   prohibiting counter-defendants from communicating with counter-claimants' investors,

28   customers, directors, board members, or other agents, employees, or representatives in a manner

DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW; BRIEFING ON PUNITIVE DAMAGES; Case No. 5:18-cv-02585-NC

1   that conditions plaintiff's agreement not to sue on a proposal that would violate antitrust laws,

2   that violates this Court's protective order, that threatens others if they do business with counter-

3   claimants, or that makes false or misleading statements or omissions that misrepresent the

4   outcome of this lawsuit.

5   **MEMORANDUM OF POINTS & AUTHORITIES ON PUNITIVE DAMAGES FOR**
    **PLAINTIFF'S TRADE SECRETS CLAIM**

6

7   **I.      Factors the Court Must Consider in Deciding Whether to Award Punitive**
            **Damages.**

8           Punitive damages for trade secret misappropriation may be awarded only where a

9   defendant is guilty of engaging in willful and malicious misappropriation.  Cal. Civ. Code §

10  3426.3(c); *Mattel, Inc. v. MGA Entertainment, Inc.*, 801 F. Supp. 2d 950, 952-53 (C.D. Cal.

11  2011) (calculation of the amount of the punitive damages is a matter for the court's discretion

12  upon plaintiff's proof of "willful and malicious" misconduct).  Likewise, the DTSA provides that

13  a court may, "if the trade secret is willfully and maliciously misappropriated, award exemplary

14  damages in the amount not more than 2 times the amount of the damages awarded under

15  subparagraph (B)."  18 U.S.C. section 1836(b)(3).

16          This means that a plaintiff must show that the defendant committed some form of

17  egregious misconduct beyond the misappropriation itself and that reflected something more than

18  a mere intention to compete with the plaintiff.  *See, e.g., Roton Barrier, Inc. v. Stanley Works*, 79

19  F.3d 1112, 1120–21 (Fed. Cir. 1996).  A mere showing that a plaintiff acted distastefully or

20  tortiously is not sufficient.  *See Ackerman v. W. Elec. Co., Inc.*, 860 F.2d 1514, 1521 (9th Cir.

21  1988) (finding no basis for imposing punitive damages, even though plaintiff had shown that

22  "the Company's actions were 'unfounded, misguided and extremely ill-advised.'").

23          In determining the amount of punitive damages, the court must consider (1) the nature of

24  the misconduct; (2) the amount of compensatory damages; and (3) the defendant's financial

25  condition.  *See O2 Micro Int'l Ltd.*, 399 F. Supp. 2d at 1079.  Under CUTSA, however, a court

26  may not make an award of punitive damages that is greater than twice the award of

27  compensatory damages.  *See Mattel, Inc.*, 801 F. Supp. 2d at 952-53.  But a punitive damages

28  award is not subject to a fixed standard; the statutory limitation merely sets a cap on the amount

25

1  of the award and the trial court retains wide discretion to set the amount anywhere between zero

2  and twice the actual loss.  *Robert L. Cloud & Assocs., Inc. v. Mikesell*, 69 Cal. App. 4th 1141,

3  1151-52, n.8 (1999).

4       Still, California courts generally are prohibited from imposing punitive damages awards

5  that exceed 10% of the net worth of the defendant.  *Michelson v. Hamada*, 29 Cal. App. 4th

6  1566, 1596 (1994) ("[Punitive] awards generally are not allowed to exceed 10 percent of the net

7  worth of the defendant."); *see also Sterling Cross Def. Sys., Inc. v. Dolarian Capital, Inc.*, No.

8  1:13-cv-01773 AWI EPG, 2015 WL 12697065, at *2 (E.D. Cal. Dec. 24, 2015) (observing that

9  "[a]s a general rule, punitive damages awards of approximately 10 percent of the defendant's net

10  worth (or less) have been upheld by California courts, while greater amounts have been set aside

11  as excessive.").

12       Furthermore, courts will consider the extent to which an award will deter future

13  misconduct in determining whether and to what extent a punitive damages award is appropriate.

14  In *Sterling Cross Def. Sys., Inc.*, 2015 WL 12697065, for example, the plaintiff sought $600,000

15  in punitive damages.  *Id.* at *2.  The district court rejected this request and awarded $110,000

16  instead because, among other reasons, the award "[wa]s sufficient but not excessive to further the

17  goals of punishing the present misconduct and deterring future misconduct."  *Id.*  Furthermore, in

18  *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1065 (N.D. Cal. 2010), the district

19  court declined to impose *any* punitive damages whatsoever because the court was "unpersuaded

20  that punitive damages [we]re necessary…to deter [d]efendants from committing future

21  violations."  The same conclusion was reached in *Stewart Title Guar. Co. v. 2485 Calle Del Oro,*

22  *LLC*, No. 15-cv-2288-BAS-WVG, 2018 WL 3222610 (S.D. Cal. June 19, 2018), where the court

23  "decline[d] to award punitive damages on the fraud claim as unnecessary to defer future

24  conduct."  *Id.* at *22.

25       Finally, courts within California have declined to award punitive damages awards where

26  other meaningful damages awards were already imposed.  In *Binder v. Disability Grp., Inc.*, 772

27  F. Supp. 2d 1172 (C.D. Cal. 2011), as an example, the district court observed that the statutory

28  damages award at issue, which imposed double damages, "[wa]s sufficient and reasonable to

26

account for Plaintiffs' losses and Defendants' conduct." *Id.* at 1184.  Accordingly, the court

exercised its discretion and declined to award punitive damages.  A similar outcome resulted in

*Washington v. City Title Loan, LLC*, No. CV 16-5427 FMO AFMx, 2018 WL 4005447 (C.D.

Cal. Feb. 26, 2018), the court declined to impose punitive damages where "[t]he court ha[d]

already awarded plaintiff statutory damages and civil penalties, in additional to actual damages."

*Id.* at *8; *see also TriPharma, LLC v. First Fruits Bus. Ministry*, No. SACV 12404 JVS (ANx),

2013 WL 12129386, at *9 (C.D. Cal. Apr. 2, 2013) (declining to award punitive damages where

the court had already awarded the defendants' profits, "which ha[d] previously been represented

to be sixty percent of their net income," as well as a "substantial" award of attorney fees).

## II.        The Verdict and Evidence Do Not Support Exemplary or Punitive Damages under CUTSA or the DTSA.

The jury was not asked about and did not find "willful and malicious" misappropriation

by RiverPay.  The jury was asked whether Citcon proved by clear and convincing evidence that

RiverPay, Hua, or Shi acted with "malice, oppression, *or* fraud" in committing trade secret

misappropriation of source code.  ECF 487, at III.1, 6:13-18 (emphasis added).  The jury circled

the "a" next to RiverPay.  Therefore, the question that the jury was asked and that the jury

answered does not include any finding of willfulness, much less any finding of willfulness *and*

malice, as required for exemplary damages under Civil Code § 3426.3(c) and 18 U.S.C. §

1836(b)(3)(C).

It is unclear from the jury's answer to Question III.1 (Punitive Damages) whether the jury

found that RiverPay acted with malice, or acted with oppression, or acted with fraud in

committing misappropriation.  Because the question is phrased in the disjunctive, the jury may

have relied on only one of the three ("malice, oppression, *or* fraud").  As such, the jury did not

necessarily find that RiverPay acted with malice, and the jury was not asked about and did not

receive any instruction on "willful," as required for a finding under Civil Code § 3426.3(c) and

18 U.S.C. § 1836(b)(3)(C).

In addition to the lack of any jury finding of willful and malicious conduct, there is no

evidence that RiverPay acted willfully and maliciously.  California law defines "malice" for

purposes of civil punitive damages as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  Cal. Civ. Code § 3294(c)(1).  The jury did not find that Hua acted with malice, oppression, or fraud.  In addition, the jury not only declined to find that Shi acted with malice, oppression, or fraud, the jury did not find Shi misappropriated any information claimed as a trade secret.  *See* ECF 487, pp. 2-4, 6-7.  The jury's findings were supported by the evidence.

### III. The Verdict and Evidence Do Not Meet California Statutory Requirements for Punitive Damages against a Corporation.

The Ninth Circuit has recognized that for purposes of punitive damages, corporations can only act through their agents and employees.  *See Protectus Alpha Nav. Co., Ltd. v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379, 1386 (9th Cir. 1985).  Neither RiverPay entity is capable of holding any mental state independent of its agents and employees.  *See Cruz v. HomeBase*, 83 Cal. App. 4th 160, 167 (2000) ("Corporations are legal entities which do not have minds capable of recklessness, wickedness, or intent to injure or deceive."); *see also Taiwan Semiconductor Mfg. Co., Ltd. v. Tela Innovations, Inc.*, No. 14-cv-00362-BLF, 2014 WL 3705350, at *6 (N.D. Cal. July 24, 2014) ("Under California punitive damages law, a company simply cannot commit willful and malicious conduct—only an individual can.").  Furthermore, under California law, "[c]orporations may be held liable for punitive damages through the malicious acts or omissions of their employees, but only for the acts or omissions of those employees with sufficient discretion to determine corporate policy."  *Davis v. Kiewit Pac. Co.*, 220 Cal. App. 4th 358, 365 (2013) (interpreting Cal. Civ. Code § 3294(b)).[3]  This limitation exists because, in California,

---

[3] California Civil Code section 3294(b) states:

An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice.  With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.

1   "the law does not impute every employee's malice to the corporation."  *Cruz*, 83 Cal. App. 4th at

2   167.

3         Here, as noted above, the jury found that neither Hua nor Shi acted with "malice, fraud,

4   or oppression," and found that *neither of them were liable for any punitive damages at all*.  *See*

5   ECF 487, pp. 6-7.  The jury's finding that RiverPay can be liable for punitive damages, despite

6   its contrary finding with respect to RiverPay's employees Hua and Shi, and without evidence

7   that any other RiverPay employee approved or took any action whatsoever with respect to the

8   source code at issue, is unsupported and legally untenable.

9         "Whether the corporation will be liable for punitive damages depends, not on the nature

10   of the consequences, but rather on whether *the malicious employee* belongs to the leadership

11   group of 'officers, directors, and managing agents.'"  *Cruz*, 83 Cal. App. 4th at 168 (emphasis

12   added); *see also Larkin v. Home Depot, Inc.*, No. 13-cv-2868-LB, 2015 WL 1049716, at *3

13   (N.D. Cal. Mar. 9, 2015) ("Section 3294 allows punitive damages to be awarded only where

14   there is 'clear and convincing evidence' that a corporate employer's 'managing agent' has been

15   guilty of 'oppression, fraud, or malice.'").

16         Here, regardless of whether or not Hua qualifies as a managing agent, Hua cannot be "the

17   malicious employee" because there is no evidence that he acted with "malice" as defined in

18   section 3294, and the jury did not so find.  *See* ECF 487, pp. 6-7.  Not only does the record lack

19   evidence that Hua used Dino Lab's code specifically to harm plaintiff or that doing so was

20   "despicable" conduct in "willful and conscious disregard" of plaintiff's rights, the evidence

21   shows Hua believed in good faith that Dino Lab owned the disputed code and could use it

22   accordingly.  *See* 5 RT 867:11-868:1, 871:22-873:3, 886:22-887:6, 913:15-914:6; 6 RT 1057:1-

23   4; Tr. Exh. 468.

24         In addition, the jury declined to find that Shi acted with "malice, oppression, or fraud,"

25   and did not find Shi misappropriated any information claimed as a trade secret.  *See* ECF 487,

26   pp. 2-4, 6-7.  The jury's findings were consistent with the evidence.  Therefore, Shi also cannot

27

28   Cal. Civ. Code § 3294(b).

1    be "the malicious employee."

2        Ryan Zheng and Simon Han also testified at trial, but their testimony did not concern

3    source code.  5 RT 742:10-764:11; 7 RT 1299:16-1309:24.  Assuming for the sake of argument

4    that these witnesses qualify as corporate policymakers, plaintiff presented no evidence that they

5    knew or approved of any act deemed to be malicious, or any act whatsoever having to do with

6    the source code at issue.

7    **IV.    The Court Should Decline to Exercise Its Discretion to Award Punitive
         Damages, because the Evidence of RiverPay's Net Worth Shows It Is Unable to
8        Pay Punitive Damages.**

9        **A.  The Court Must Consider RiverPay's Ability to Pay.**

10       California courts consider "evidence of the defendant's financial condition" "essential for

11   evaluating whether the amount of punitive damages actually awarded is appropriate."  *Robert L.*

12   *Cloud & Assocs., Inc.*, 69 Cal. App. 4th at 1151 n.8.  The ability of the defendant to pay must be

13   considered, because "the function of punitive damages is not served by an award which, in light

14   of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to

15   properly punish and deter."  *Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 928, n.13 (1978).

16   Whether the amount of punitive damages is excessive in a particular case depends on the

17   defendant's ability to pay, and "[e]vidence of a defendant's financial condition is a legal

18   precondition to the award of punitive damages."  *Soto v. BorgWarner Morse TEC Inc.*, 239 Cal.

19   App. 4th 165, 194-95 (2015).

20       The plaintiff has the burden of introducing evidence of the defendant's financial

21   condition at trial.  *Adams v. Murakami*, 54 Cal. 3d 105, 119 (1991).  If the plaintiff fails to

22   present such evidence, the punitive damages award cannot stand.  *See id.* at 119-23.  The

23   requirement that plaintiff present evidence of the defendant's financial condition applies in trade

24   secret misappropriation cases.  *See Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 46

25   n.11 (1992) (under *Adams*, "substantial evidence of [a defendant's] financial condition" is

26   required to award punitive damages under CUTSA.

27       To establish a defendant's net worth, "the 'net' concept of the net worth metric remains

28   critical."  *Soto*, 239 Cal. App. 4th at 194; *Boyle v. Lorimar Prods.*, 13 F.3d 1357, 1361 (9th Cir.

1  1994) ("only net, not gross, figures are relevant.").  "Normally, evidence of liabilities should

2  accompany evidence of assets, and evidence of expenses should accompany evidence of

3  income." *Baxter v. Peterson*, 150 Cal. App. 4th 673, 680 (2007).

4  　　　"In most cases, evidence of earnings or profit alone are not sufficient 'without examining

5  the liabilities side of the balance sheet.'" *Id.* (quoting *Kenly v. Ukegawa*, 16 Cal. App. 4th 49, 57

6  (1993)).  Evidence of a defendant's income or assets is inadequate to show financial condition,

7  because income and assets show only one side of the equation and do not indicate ability to pay.

8  *See Alexander v. Incway Corp.*, 633 Fed. App'x 472, 474 (9th Cir. 2016) (evidence of gross

9  deposits alone shed no light on net worth); *Boyle*, 13 F.3d at 1361 (evidence of gross revenue

10  insufficient); *Soto*, 239 Cal. App. 4th at 195 (evidence of revenue insufficient); *Baxter*, 150 Cal.

11  App. 4th at 681 (evidence of assets insufficient); *Kelly v. Haag*, 145 Cal. App. 4th 910, 917

12  (2006) (evidence of assets insufficient); *Lara v. Cadag*, 13 Cal. App. 4th 1061, 1064 (1993)

13  (evidence of income insufficient).

14  　　**B.  The Evidence Shows the RiverPay Entities Are Unable to Pay Punitive Damages.**

15  　　RiverPay is unable to pay punitive damages.  The evidence shows that RiverPay did not

16  operate at a net profit in 2017.  Hua, 5 RT 919:11-920:3, 922:25-923:3; Tr. Exh. 76, p.

17  DEF018550.  In 2017, RiverPay operated at a net loss of $74,017.  Hua, 5 RT 919:11-920:3,

18  922:25-923:3; Tr. Exh. 76, p. DEF018550.  In 2017, RiverPay's operating expenses were

19  $201,211.  Tr. Exh. 76, p. DEF018550.

20  　　RiverPay did not operate at a net profit in 2018.  Hua, 5 RT 919:11-920:3, 922:25-923:3;

21  Tr. Exh. 76, p. DEF018550.  In 2018, RiverPay operated at a net loss of $2,916.  Hua, 5 RT

22  919:11-920:3, 922:25-923:3; Tr. Exh. 76, p. DEF018550.

23  　　In 2018, RiverPay's operating expenses went up to $953,744, an increase of

24  approximately 4.75 times from the year before.  See Tr. Exh. 76, p. DEF018550.  From January

25  to September, 2019, RiverPay had $7,650,303.68 in total revenues and $6,518,580.05 in COGS

26  (Costs of Goods Sold), for a "gross margin" of $1,131,723.63.  Tr. Exh. 1176.  This does not

27  include actual operating expenses – only "costs of goods sold" or "costs of sales."  Tr. Exh.

28  1176; Hua, 5 RT 923:7-13; Mangum, 7 RT 1333:19-1334:4.  "Costs of goods sold"/"Costs of

1    sales" are payments to a third party that are related to the transactions and associated revenue.

2    *See* Mangum, 7 RT 1326:5-1327:19; *see also* Hua, 5 RT 920:9-921:1.

3      RiverPay's gross profits through 2019 are $722,674, which still does not account for all

4    of RiverPay's costs – only costs related to the revenues.  *See* Mangum, 7 RT 1332:13-1334:22.

5    To date, RiverPay is still operating at a loss. Hua, 6 RT 1054:12-14.

6      RiverPay's preferred stock purchase agreement provides that investment funds are to be

7    used "to fund the Company's existing operations and for general corporate purposes or as

8    otherwise approved by the Board of Directors (which approval must include the approval of the

9    directors appointed by the Purchasers), and to pay the fees and expenses incurred by the

10   Company in connection with the transactions completed by this Agreement."  Tr. Exh. 1134,

11   section 1.3.  The preferred stock purchase agreement prohibits the use of "any proceeds from the

12   sale of the Preferred Stock to repay any outstanding debts of the Group Companies or to redeem

13   any outstanding Common Stock or other equity."  Tr. Exh. 1134, section 1.3.

14     Section 1(c) of RiverPay's SAFE Agreements provides as follows:

15     If there is a Dissolution Event before this instrument expires or terminates, the Company
     will pay an amount equal to the Purchase Amount, due and payable to the Investor
16   immediately prior to, or concurrent with, the consummation of the Dissolution Event.
     The Purchase Amount will be paid prior and in preference to any Distribution of any of
17   the assets of the Company to holders of outstanding Capital Stock by reason of their
     ownership thereof.  If immediately prior to the consummation of the Dissolution Event,
18   the assets of the Company legally available for distribution to the Investor and all holders
     of all other Safes (the 'Dissolving Investors'), as determined in good faith by the
19   Company's board of directors, are insufficient to permit the payment to the Dissolving
     Investors of their respective Purchase Amounts, then the entire assets of the Company
20   legally available for distribution will be distributed with equal priority and pro rata
     among the Dissolving Investors in proportion to the Purchase Amounts they would
21   otherwise be entitled to receive pursuant to this Section 1(c).

22   Tr. Exhs. 23, 24, and 32, p. 2 (italics added).  A "Dissolution Event" "means (i) a voluntary

23   termination of operations, (ii) a general assignment for the benefit of the Company's creditors or

24   (iii) any other liquidation, dissolution or winding up of the Company (excluding a Liquidity

25   Event), whether voluntary or involuntary."  Tr. Exhs. 23, 24, and 32, p. 3.

26     A "Liquidity Event" "means a Change of Control or an Initial Public Offering."  Tr.

27   Exhs. 23, 24, and 32, p. 3.  If there is a "Liquidity Event," the investor may opt to receive "a cash

28   payment equal to the Purchase Amount," but if there are insufficient funds to pay all the Cash-

DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW; BRIEFING ON PUNITIVE DAMAGES; Case No. 5:18-cv-02585-NC

Out investors in full, "all of the Company's available funds will be distributed with equal priority and pro rata among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price." Tr. Exhs. 23, 24, and 32, p. 1.

If RiverPay went bankrupt, it is not clear there would be enough money to pay everything back to the preferred stock holders. Mangum, 7 RT 1343:4-12. The preferred stockholders would need to be fully paid before the common shareholders get anything. Mangum, 7 RT 1343:4-12; *see also* Hua, 6 RT 996:20-997:12.

At the end of 2018, RiverPay's total assets were $7,499,821 (which includes investment funds and $2,042,503 in "accounts receivable"). Tr. Exh. 76, p. DEF018548. RiverPay's total liabilities and shareholders' equity were $7,499,821 (which includes the share capital and $1,605,743 in "accounts payable"). Tr. Exh. 76, p. DEF018548. RiverPay had $3,766,453 in cash, which reflected the cash left over from the investment funds. Tr. Exh. 76, p. DEF018551; Hua, 6 RT 995:15-996:4.

As of the end of 2019, RiverPay's remaining investment funds had been spent on business expenses, including attorneys' fees incurred as a result of this action. Hua, 6 RT 996:7-19.

Thus, the evidence reflects that RiverPay's net worth is zero, due to its lack of profit since its inception, its ongoing debt to its investors, and the reasonable expenditure of all of its resources on business expenses including this lawsuit. However, if the Court awards exemplary damages and determines that RiverPay's net worth exceeds zero, the Court may award no more than ten percent (10%) of RiverPay's net worth as exemplary or punitive damages. *See Michelson*, 29 Cal. App. 4th at 1596; *Sterling Cross Def. Sys., Inc.,* 2015 WL 12697065, at *2.

**V.    The Court Should Decline to Exercise Its Discretion to Award Punitive Damages, because Such An Award Would Not Meet Constitutional Standards.**

The Due Process Clause of the Fourteenth Amendment substantively limits an award of punitive damages. *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 562 (1996) ("*BMW*"). "Whether

1   an award of punitive damages exceeds the bounds of due process is determined on a case-by-

2   case basis by examining: (1) the reprehensibility of the conduct being punished; (2) the ratio of

3   the punitive damages award to the compensatory damages award; and (3) the difference between

4   the punitive damages award and the civil penalties authorized or imposed in comparable cases."

5   *Flores v. City of Westminster*, 873 F.3d 739, 759 (9th Cir. 2017) (citing *BMW*, 517 U.S. at 568,

6   575, 580-83).  An excessive award "cannot be justified on the ground that it was necessary to

7   deter future misconduct without considering whether less drastic remedies could be expected to

8   achieve that goal."  *BMW*, 517 U.S. at 584.  Single-digit ratios between punitive and

9   compensatory damages are more likely to satisfy due process.  *State Farm Mut. Auto. Ins. Co. v.*

10   *Campbell*, 538 U.S. 408, 425 (2003) ("*State Farm*").

11         "[T]he most important indicium of the reasonableness of a punitive damages award is the

12   degree of reprehensibility of the defendant's conduct."  *BMW*, 517 U.S. at 575.  The Supreme

13   Court has instructed courts to determine the reprehensibility of a defendant by considering

14   whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an

15   indifference to or a reckless disregard of the health or safety of others; the target of the conduct

16   had financial vulnerability; the conduct involved repeated actions or was an isolated incident;

17   and the harm was the result of intentional malice, trickery, or deceit, or mere accident."  *State*

18   *Farm*, 538 U.S. at 419.  A jury finding of willful and malicious trade secret misappropriation,

19   without more, is not a sufficient finding of reprehensibility to guarantee exemplary damages.

20   *See EnerTrode, Inc. v. General Capacitor Co. Ltd.*, No. 16-cv-02458-HSG, 2019 WL 1715170,

21   at *8-9 (N.D. Cal. April 17, 2019) (denying plaintiffs' motion for exemplary damages where the

22   jury found willful and malicious misappropriation; defendant did not harm third parties, commit

23   acts of misconduct over a long period of time, or misappropriate more than one trade secret).

24         The Court should accord "substantial deference" to legislative judgments regarding civil

25   penalties for analogous conduct.  *See BMW*, 517 U.S. at 583.  In *BMW*, the court found that

26   various state statutes imposing civil penalties ranging from $2,000 to $10,000 for deceptive trade

27   practices did not provide fair notice to defendant that it might be subject to a multimillion dollar

28   penalty for similar conduct.  *See BMW*, 517 U.S. at 583-84.  California's unfair competition law

1   provides a civil penalty up to $2,500 for a "fraudulent business act."  *See* Cal. Bus. & Prof. Code

2   § 17206(a).

3         Here, the jury found misappropriation of one trade secret by RiverPay and awarded

4   substantial unjust enrichment damages of $1.5 million.  In light of the evidence showing that

5   RiverPay reasonably believed it was entitled to use the code at issue, the evidence of RiverPay's

6   financial condition, and the size of the customary statutory penalties for similar violations, no

7   additional punitive damages are reasonable or necessary to deter any future misconduct.  *See,*

8   *e.g., Sterling Cross Def. Sys., Inc.*, 2015 WL 12697065 at *2; *Craigslist, Inc.*, 694 F. Supp. 2d at

9   1065; *Stewart Title Guar. Co.*, 2018 WL 3222610 at *22.  Imposing substantial punitive

10  damages on the RiverPay entities on top of the hefty unjust enrichment damages that RiverPay

11  already faces would violate constitutional due process.

12

13  DATED:  January 10, 2020                    McMANIS FAULKNER

14                                              /s/ Christine Peek
                                                CHRISTINE PEEK
15
                                                Attorneys for Defendants and Counter-
16                                              Claimants

17

18

19

20

21

22

23

24

25

26

27

28